THE STATE v. MADDOX, *Appellant.*

Division Two, November 9, 1893.

1. **Criminal Practice**: CONTINUANCE. While an application for continuance is addressed to the sound discretion of the trial court, and the propriety of granting or refusing it depends much on the peculiar facts of each case, yet its action is reviewable by the supreme court.

2. ———: ———. It is error to refuse an application by defendant for a continuance on a trial for robbery, in order to procure the attendance of his wife as a witness, by whom he expects to prove an *alibi*, where she is too ill to attend court or to have her deposition taken, and the principal issue in the case is the identification of the defendant as the guilty party.

*Appeal from Shelby Circuit Court.*—HON. T. H. BACON, Judge.

REVERSED AND REMANDED.

*R. P. Giles* for appellant.

(1) The court erred in refusing the defendant a continuance. He had shown due diligence and the testimony was material to his defense, and it was a clear abuse of the trial court's discretionary power and should not be upheld nor indorsed. (2) Instructions numbered 4 and 5, defining reasonable doubt, are confusing and are open to the objection of emphasizing the "mere possibility of innocence," and instruction number 6 should not have been given, because it fritters away the benefits of the presumption of innocence. (3) The court erred in giving the instruction number 8 upon casual statements of defendant and refusing the instruction asked by the defendant upon that subject. *State v. Glahn*, 97 Mo. 579; *State v. Moxly*, 102 Mo. 374. (4) Instruction number 10, informing the jury

that United States treasury notes are not taxable, should not have been given.   (5) The court ought to have given an instruction on the question of *alibi*, which was a defense supported by the evidence of a number of witnesses, and raised a question of law requiring an instruction for the information of the jury in giving their verdict.    *State v. Lewis*, 69 Mo. 92; *State v. Howell*, 100 Mo. 628; *State v. Edwards*, 109 Mo. 315. (6) It was the duty of the court to instruct the jury on all questions of law arising in the case, which were necessary for their information in giving their verdict. Revised Statutes, 1889 sec. 4208; *State v. Henson*, 106 Mo. 66; *State v. Patrick*, 107 Mo. 147; *State v. Palmer*, 88 Mo. 568.    (7) The evidence is not sufficient to support a conviction.    (8) The court ought, for the above reasons, to have granted a new trial and for failing to do so, the case ought to be reversed.    (9) The indictment is defective in that it does not state facts suficient to constitute any offense under the laws of Missouri.

*R. F. Walker*, Attorney General, *Morton Jourdan*, assistant, and *B. T. Hardin* for the state.

(1) The appellant's application for continuance was properly overruled.   Appellant showed absolutely no diligence in trying to secure the testimony of the absent witness.   *State v. Dusenberry*, 112 Mo. 277, *loc. cit.* 290; *State v. Carter*, 98 Mo. 176; 104 Mo. 403. Nothing in the physician's certificate shows that the deposition of the witness could not have been taken, and all intendments are taken against the statements in the application.   *State. v Pagels*, 92 Mo. 300.    (2) It was largely in the discretion of the trial court to pass upon appellant's application for continuance, and this court will not interfere with such discretion in over-

ruling such applications, unless that discretion has been unsoundly or oppressively exercised and abused. *State v. Carter*, 98 Mo. 176; *State v. Day*, 100 Mo. 242; *State v. Parker*, 106 Mo. 217. (3) "Every presumption will be indulged in favor of the correctness of the action of the trial court, particularly in granting and refusing continuances." *State v. Gamble*, 108 Mo. 500–505. (4) Again, the counter-affidavits of three witnesses were before the court, showing that the absent witness was walking around home and on the streets at the time of the trial. *State v. McCoy*, 111 Mo. 517. (5) The record shows that the court, "on its own motion," gave instructions numbered 1 to 11, inclusive. Appellant's motion for new trial says that those numbered 6 and 10 were given as asked by the state. Said motion, however, is no evidence of the statements therein made. *State v. McDaniel*, 94 Mo. 301. There would be no difference, however, in legal effect. Appellant asked but one instruction, which was refused, and another numbered 8 substituted, which, in law, is much more favorable to appellant than the one asked in his behalf. In argument, it may not be considered so good a speech to the jury. All the law in the instruction asked is embraced within the one given, and no error was committed in refusing the one. *State v. Walton*, 74 Mo. 271; *State v. Mathews*, 98 Mo. 119; *State v. Moore*, 101 Mo. 317; *State v. Mounce*, 106 Mo. 226. Besides, it should have been refused, because little more than an argument to the jury. (6) There was no reversible error in the instructions given by the court.

GANTT, P. J.—The defendant was indicted by the grand jury of Ralls county on the twenty-fourth of March, 1891, together with Frank Whitecotten, for robbery in the first degree of John L. McElroy on the night of the twenty-first day of December, 1890. The

defendants were arraigned at the same. term, and by consent the cause was continued to the August term, which commenced August 24, 1891. At that term a change of venue was awarded to Shelby county. At the November term, 1891, of the Shelby circuit court a severance was granted, and the case as to the appel- lant, Morgan Maddox, was continued by order of the court, of its own motion, to the next term of court. At the April term, 1892, owing to the impassable condition of the roads, the entire docket was continued to June of that year. At the June session this cause was by mutual consent continued to Monday, Septem- ber 5, 1892, at the adjourned term. At that time, defendant Maddox filed the following application for a continuance:

"In the circuit court of Shelby county, Missouri, April term, 1892.

"The defendant, Morgan Maddox, comes and moves the court to grant him a continuance in. this cause to the next term of this court, and as grounds for this motion states the following:

"*First*. That Champ Clark, an attorney-at-law, is one of the counsel for this defendant in this cause, and has been such counsel ever since the indictment in this cause was found, and that said Champ Clark, as such counsel, is in charge of portions of the work in making the defense in this cause, which were pecu- liarly in the charge and knowledge of said Clark.

"That said Clark is a resident of the city of Bowling Green, in Pike county, Missouri, and is a member of the bar at that place, and has a large practice as such attorney in the circuit court of said Pike county.

"That the regular September term, 1892, of said Pike circuit court, is begun on this day, to-wit, the fifth day of September, 1892,

"That the docket of said circuit court of Pike county is set so that there are a great many of the cases in which said Clark is of counsel, set for trial on every day, beginning with this day and ending on the fifteenth day of September, 1892.

"That said cases in which said Clark is engaged as counsel are important cases, and by reason of said employment of said Clark in said cases, in said Pike circuit court, he, the said C. Clark, cannot be present at the trial of this cause at the present term of this court, and that if the defendant is compelled to go to trial without the presence and aid of said Clark as such counsel, a great and material harm would be done this defendant, and this defendant would be deprived of the means of making a full and fair defense in this cause.

"*Second.* The defendant states that Malinda Maddox, the wife of the defendant, Morgan Maddox, is a material witness on behalf of the defendant, Morgan Maddox, in this cause.

"That her residence is at the town of Huntington, in Ralls county, Missouri, where she now is.

"That on the night of the twenty-fifth day of August, 1892, the said Malinda Maddox had an abortion or miscarriage about twelve o'clock on said night. She then had a severe chill and her temperature arose to one hundred and five degrees, her pulse was one hundred and fifty, she showing and having all the symptom of septicæmia, resulting from the absorption of a putrid fœtus and its membranes. She is now confined to her room, and nearly all the time in her bed, under the order of her physician, and it is the opinion of her physician, S. Mattox, a regular registered and practicing physician, who is now attending her, and who has been attending her since the time of the said abortion, that it would not be safe for her,

under the most favorable circumstances, to leave her home under six weeks from the time said abortion took place. And this affiant says her condition is such that it would not be safe under the most favorable circumstances, for her to leave her home and be present at the trial of this cause under six weeks from the time said abortion took place.

"This affiant further says that said Malinda Maddox has been so ill ever since said abortion that she could not give her deposition in this cause without endangering her life.

"That this cause was set for trial in this court in November, 1891, at the October term, 1891, of this court on the twenty-third day of November, 1891.

"That this defendant caused a subpœna to be issued from the office of the clerk of this court on the thirteenth day of November, 1891, for said Malinda Maddox, and placed said subpœna in the hands of the sheriff of Ralls county, Missouri, for service on said witness.

"That said subpœna was duly served on said Malinda Maddox, during said trial, by the said sheriff on the twenty-fifth day of November, 1891, in Ralls county, Missouri, and that said Malinda Maddox obeyed said subpœna and appeared in this court at said time in this cause, and after a severance as to the defendants, Maddox and Whitecotten, testified on behalf of the co-defendant, Frank Whitecotten on his trial at said term of this court, and that the trial of this cause had been by this court regularly continued from the said last mentioned term until this time, and it was the duty of said witness, under the statute, to attend as a witness on behalf of this defendant on the trial of this cause at the time without further subpœna.

"That said Malinda Maddox will testify on the trial of this cause if present, as follows: 'I am the wife of

the defendant, Morgan Maddox, and was his wife on the twenty-first day of December, 1890, at the time of the alleged robbery of Leland McElroy and was living with said Maddox as his wife at his home in the town of Huntington, Mo., about one and a half miles from the place of said alleged robbery.'

"That she was at home all of the afternoon and evening and night of said December 21, 1890.

"That this defendant, at the hour of six o'clock in the evening of said December 21, 1890, was present at his and her home in said town of Huntington, and took supper there shortly after said hour and that said Morgan Maddox remained at their said home from said hour of six o'clock on said evening until the hour of eight o'clock on the night of said December 21, 1890, at which last mentioned time, Maje Maddox announced to the witness and said Morgan Maddox at their said home, that Leland McElroy had been robbed on said night, except for a space of time not exceeding twenty minutes, and that during said twenty minutes, said Morgan Maddox went to the barn at their home, saying that he, said Morgan Maddox, was going to attend to their horses.

"That said Morgan Maddox was not absent from said house longer than said space of twenty minutes from said hour of six o'clock until after said Morgan Maddox was notified at his home of said robbery.

"That the testimony of Leland McElroy and Mary McElroy, who are in attendance on this court as witnesses for the prosecution in this cause, will be that said robbery of said Leland McElroy, with which said defendant stands charged, occurred between the hour of six o'clock and eight o'clock on said December 21, 1890, in the evening of said day, about one and a half miles from the said home of the said defendant.

"That the testimony of said Malinda Maddox, as above set forth, tends to prove and does prove a complete *alibi* for this defendant as to said robbery.

"That the testimony of said Leland McElroy, as the prosecuting witness in this cause, will be that said Morgan Maddox was present at the time and place of said robbery, participating therein.

"That the testimony of Malinda Maddox, as above set forth, is material to the issue of this cause on behalf of the defendant, Morgan Maddox.

"That this defendant has used due diligence to obtain the testimony of said witness Malinda Maddox, on this trial of this cause.

"That the testimony of said witness can be procured on the trial of this cause by and at the next term of this court, and that said Malinda Maddox, will prove facts as above set forth, and this defendant believes said facts, as above set forth as said witness' testimony are true, and that this defendant is unable to prove said facts by any other witness whose testimony can be as readily procured, and that said witness, Malinda Maddox, is not absent by the connivance, procurement or consent of this defendant, and that said Malinda Maddox, is absent from this trial solely because said witness, Malinda Maddox, is sick and unable to attend at the trial of this cause, and that this application for continuance is not made for vexation or delay merely, but to obtain substantial justice on the trial of this cause.

"(Signed.) MORGAN MADDOX.

"STATE OF MISSOURI, ⎫
 ⎬ ss.
"County of Shelby. ⎭

"Morgan Maddox, the above named defendant, being duly sworn on his oath states that the facts

stated in the foregoing application for a continuance are true.

"(Signed)             MORGAN MADDOX.

"Subscribed and sworn to before me this September 5, 1892.

"(Signed)             FRANK DIMMITT,
                                      "Clerk."

The circuit court overruled the application, and defendant was put upon his trial, and was convicted and sentenced to the penitentiary for nine years.

The evidence tended to prove that John L. McElroy, who was robbed, was then about seventy-six years of age, and lived on his farm in Ralls county, Missouri, about one and a half miles from Huntington, a small railroad town on the line of the Missouri, Kansas & Texas railway. His family consisted of his wife, who was very old and feeble, and two unmarried daughters of middle age. The defendant, Morgan Maddox, lived in Huntington, where he was engaged in livery business, the other defendant, Frank Whitecotten, lived on a farm with his father near the village of Sidney, which is three or four miles distance from Huntington.

From the testimony of John L. McElroy and his daughter, Miss Mary McElroy, the only one of his family besides himself who testified, it appears that the robbers came to the house of John L. McElroy shortly after six P. M., December 21, 1890. Miss Mary testified that two men came to the front door, one of whom she saw through the window, and that she recognized him to be Frank Whitecotten by his voice, and that she believed the other man to be Morgan Maddox, *though she neither saw him nor heard him speak;* that she heard them go into her father's room, after which she, her mother, and her sister made their escape to a neighbor's house.

John L. McElroy testified that both of the men wore masks, and that he recognized Frank Whitecotten from seeing his face when his mask dropped down, and from hearing him talk; and, that *he recognized Morgan Maddox from his heighth, appearance, and. movement, and that he also heard him speak while in the room, but did not see his face;* that the men remained in the room less than an hour, but he could not state the exact time. That, after they left he caught his horse and went to the house of John Maddox, the father of Morgan Maddox, which was distant a little over one-fourth of a mile; that his purpose of going there was to look for his family, and while there, he requested that Maje Maddox, a brother of defendant, Morgan Maddox, might be sent to Huntington to tell them to watch to see who got on the train. He then returned home, where he found many of his neighbors assembled, but he did not tell them that he knew who robbed him, though questioned by them with a view to aid in their capture.

Sam Burrell, a witness for the state, testified that, on that night he saw four men fifty yards off, in a thicket, not far from McElroy's house, and heard one of them say: "Ain't those bright yellow fellows;" and heard one of them address the other as "Morg;" then he recognized the voice of one of them, as that of Frank Whitecotten; then he afterwards saw two men climb a fence some distance away from him; *that he did not see their faces, but recognized them to be the defendants by their movements;* that, on the next day he found a sack which Mr. McElroy identified as having contained part of the money, near the spot where he saw the four men; that he notified Mr. McElroy about finding the sack the same day, *and that he said nothing to him, or the prosecuting attorney about having seen the four men until six weeks thereafter.* Three witnesses for the state

testified that Morgan Maddox had proposed to them, separately, some time before December 21, 1890, to rob John L. McElroy, and other witnesses testified that the defendant, Morgan Maddox, had stated to them that John L. McElroy had, or kept, money about the house.

For the defense, evidence was introduced that the defendants, Morgan Maddox and Frank Whitecotten, were both at the house of the former, in Huntington, one and a half miles distance from the scene of the robbery, at the time it was alleged to have been committed. It was shown by the testimony of several witnesses that about 5:30 P. M., or later, Morgan Maddox went to Dick Smith's, who lived about one-fourth of a mile north of Huntington, and one and three-quarter miles from John L. McElroy's; that after getting a bucket of water he walked down to his livery stable, in Huntington, where he conversed with other persons, *and offered to accompany a lady, who was seeking a conveyance, on a trip several miles in the conntry;* that he then went to his house, which was about sixty or seventy yards from his livery stable, and remained there until after supper; eating supper at home between six and seven o'clock, in the presence of his wife, and other persons; that, after supper he remained in the house until a short time before seven o'clock, when he went to his livery stable in Huntington, where he was seen about seven o'clock by Walter Boarman, as he passed through the town to his home in the neighborhood; that after remaining at the livery stable about fifteen minutes, he returned to his house, and there remained in the company of others until he was notified a short time after eight o'clock, that the robbery had been committed. It was also shown that Frank Whitecotton ate supper at Morgan Maddox's between six and seven o'clock, and that he was there at his house and never

out of it, from five o'clock until after notice was received that the robbery had been committed.

It was also shown that, when John L. McElroy went to John Maddox's, immediately after the robbery, after telling them that he had been robbed, he requested Maje Maddox, a brother of the defendant, Morgan Maddox, to go to Huntington and tell them to watch the trains, *to see if any strangers got on the trains;* that after he returned to his home that night he stated to the constable and the justice of the peace and a number of other persons among the neighbors, that he did not know who the robbers were, and that he could give no further description than that he heard the voice of one of them, and that it sounded familiar. He stated to Thomas Spalding, the constable, and Mr. Ragor, then deputy assessor of the county, and others, that he did not know who the men were, and had no idea, except the voice of one of them sounded like that of a man he had seen at Sydney, in Squire Engle's store the Saturday before, a man who had his coat off, who Engle said was a tie chopper. That he authorized Mr. Engle, the justice of the peace, in presence of four or five others, to send a telegram to Hannibal and other points, giving a description of the men, one as five feet, seven or eight inches high, and the other as five feet, ten or eleven inches high, and offering a reward of $500 for their arrest, and for the recovery of the money. That at the time this telegram was authorized to be sent, the defendant, Morgan Maddox, was there in his house, and in his presence, and in the presence of the officers and twenty or twenty-five of his neighbors.

It appeared from the cross-examination of John L. McElroy, that he did notify the prosecuting attorney that he recognized the defendants as the persons who robbed him, until six weeks after the robbery. That he knew that Mr. Allison went into the office of the

prosecuting attorney January 1, 1891, and that he did not disclose the fact to him until about the middle of February; that he assigned various reasons for concealing his knowledge of the identity of the defendants. At one time he said it was because he feared that they might take his life; at another time he said it was because he feared the defendant might be mobbed, then again his answer was that he thought if he kept quiet he might recover some of his money, and then he answered that he thought time and its concomitants might develop something.

The house in which McElroy lived consisted of two rooms, separated by a hallway, and fronts west. The house is entered at the front door of the hall, with a door leading north to one room from the hall, and one south to the other room. On the night of the robbery McElroy occupied the north room, while his wife and two grown daughters occupied the south room. At about seven o'clock (for the time is variously estimated by the witnesses) on the evening of December 21, 1890, two men, whom McElroy and his daughter claim to have recognized as Morgan Maddox and Frank Whitecotton, began pounding upon the front door, saying: "There's money in this house, there's money in this house; money, money, is what we want, and we are going to have it." Then they broke into the house through the outer door; then kicked the door of the south room, which was occupied by the women, but did not enter; they then turned and broke into the north room occupied by McElroy, breaking the panels of the door, one being armed with a huge club, the other with a revolver, which was placed to the old man's head, and kept there until they had secured $2,000 in gold coin and $2,500 in greenback bills, each of the denomination of $100, which they found in an old trunk under the bed. It is also established by the testimony that

Whitecotton's right hand was sore before the robbery, and that the man who held the pistol to McElroy's head during the robbery had his right hand wrapped and held the pistol in his left.    Both the robbers were masked; but when the robbery was being perpetrated, Mr. McElroy says the mask slipped down so that he could, and did recognize one as Frank Whitecotton.. How far down the mask came is not clearly shown. The night was a clear moonlight night.

I.   The first and principal assignment of error is the action of the trial court in refusing a continuance on the affidavit of defendant.   In connection with this affidavit, was presented to the court the certificate of the attending physician, Dr. S. Mattox.   It was admitted and conceded by the prosecuting attorney that the certificate was in the genuine and proper hand-writing of Dr. Mattox, and that at the date it was given Dr. Mattox was a regularly practicing physician in good standing, near Ely, Marion county, Missouri. · The certificate is as follows:

"ELY, Mo., September 5, 1892.

"This is to certify that I waited upon the wife of Morgan Maddox the night of August 25, 1892, and that abortion took place about twelve o'clock of said night.   She had a severe chill and temperature rose to one hundred and five degrees, pulse one hundred and fifty, with delirium, showing all the symptoms of septicæmia, resulting from the absorption of putrid fœtus and its membranes, and I should not think it would be safe for her, under the most favorable circumstances, to leave her room under six weeks from the time the abortion took place.

"(Signed)               S. MATTOX, M. D."

The defendant and his wife lived at Huntington, in Ralls county; the trial took place at Shelbyville, the county  seat  of  Shelby county. · Shelbyville  is  not

reached by any railroad.     To have reached it, it was
necessary for her to ride by the cars on the Missouri,
Kansas & Texas to Monroe City, thence to Shelbina,
Hunnewell, or some other station on the Hannibal &
St. Joseph Railroad, and thence across the country for
at least twelve miles.     An application for continuance
is addressed to the sound discretion of the trial court,
and the propriety of granting, or refusing it, depends
much on the peculiar facts of each case, but it has been
held from the foundation of this state to this time,
that this discretion of the trial court was reviewable
in this court, and this court reserves the right to inqu're
into the facts of each case, and reverse if the continu-
ance was improperly refused.     *McLane v. Harris*, 1
Mo. 701; *Riggs v. Fenton*, 3 Mo. 28; *Tunstall v. Hamil-
ton*, 8 Mo. 500; *State v. Wood*, 68 Mo. 444; *State v.
Maguire*, 69 Mo. 197; *State v. Walker*, 69 Mo. 274;
*State v. Farrow*, 74 Mo. 531; *State v. Lewis*, 74 Mo.
222; *State v. Berkley*, 92 Mo. 41; *State v. Anderson*,
96 Mo. 241.     Was the continuance improperly refused
in this case?

It will be observed that the defendant's affidavit
meets every requirement of section 4181, Revised
Statutes, 1889.     It shows first the materiality of his
wife's evidence; that by her, he expected to establish
a complete *alibi*, by showing that at the time Mr. Mc-
Elroy was being robbed, the defendant was at his
home in Huntington, a mile and one half from the
scene of the robbery.

When it is considered that the guilt of this defend-
ant depends largely upon his identification as one of
the robbers by Mr. McElroy and his daughter, Miss
Mary; that Mr. McElroy was an old gentleman of
seventy-six years; suddenly attacked in his quiet
country home by two masked men; that one of them
placed a revolver at his head, and kept it there nearly

all the time the robbery was being perpetrated, and that he must have been laboring under more or less mental excitement; that he did not see the defendant's face, that the light in the room was an ordinary candle, and the fire light in the fireplace; did not identify him by his clothing in any way, and only claimed afterwards that he recognized him by his walk, shape and voice, but that he only heard him speak a few words in a low tone; that he never made known to the prosecuting attorney, or his neighbors that he suspected defendant until the middle of the next February, but that many of his neighbors testified that when asked on the night of the robbery when surrounded by his neighbors,. and ¡lifelong friends, if he recognized the robbers, said he did not; and that his daughter, Miss Mary, admits that she neither saw the defendant or heard him speak on the occasion of the robbery, it was of the highest importance to defendant to have the benefit of any and all evidence that tended to show he was at Huntington and not at Mr. McElroy's at the time of the commission of the crime.

His wife's evidence was most material to him. He shows that she had been duly subpœnaed in the cause and where she was at the time of the trial, and a strong probability that she could be procured for another time.  He avers his belief in the truth of her testimony, and, "that he was unable to prove said facts by any other witness whose testimony could be as readily procured;" that she was not absent by his consent, connivance or procurement; that his application was not made for vexation or delay merely, but to obtain substantial justice.  He shows that within ten days before he made this affidavit, his wife had suffered an abortion; that she had all the symptoms of septicæmia; that delirium and excessive temperature accompanied her sickness, that she was confined to

her room, and nearly all the time to her bed, under the orders of her physician; that it would endanger her life to bring her to court, or take her deposition in time for trial.

Her condition was fully corroborated by her physician's certificate, and he is admitted to be a physician of good standing in that community. The only possible suggestion that can be made against the sufficiency of this affidavit, is that the physician's certificate does not say she was too ill to have her deposition taken, but the affidavit does, and the physician's certificate discloses a condition in which the court' as well as an expert, could see the defendant's wife ordinarily under such circumstances, would be in no condition to stand the excitement of the examination, and cross-examination in a trial involving the liberty of her husband.

We think the court, under these conditions, erred in refusing a continuance. The defendant had never been accorded a continuance on his own application. In the very nature of things he could not anticipate the misfortune that befell his wife so close to the trial, and even if her deposition might have been taken, why should he have been deprived of having her deliver her evidence *ore tenus* before the jury at the time and place of trial. As the law had been repealed which allowed his statement of her evidence in his affidavit to be read to the jury, he was deprived even of that poor makeshift.

But it is argued by the attorney general that inasmuch as the state filed in the court the next day after this motion had been overruled the affidavits of three witnesses to the effect that they saw Mrs. Maddox in her yard at Huntington as they passed on their way to the trial, and could not discern that she was sick, we must take it, the court was justified in refusing to continue the cause. We cannot see how these subse-

quent affidavits affect the question. They most clearly did not affect the judgment of the learned judge who decided the point, because they were not in existence then, and for aught that this record discloses he had never seen, or heard them read. It would be improper for us to review them inasmuch as the record nowhere shows that he ever passed on their sufficiency. His ruling was made upon the motion and affidavit of defendant alone with the physician's certificate. It is that ruling we are called upon as a court of error to review, and not the subsequent, *ex parte* affidavits that were filed in the cause, and upon which he took no action whatever.

As to the criticism of the counsel on the eleventh instruction, as this case must be tried again, we think with counsel, if it is necessary to instruct a jury to sign their verdict in ink, it is just as essential that the verdict of *acquittal* should be so signed as one of *conviction*.

The fourth instruction correctly placed the defense of *alibi* before the jury, and no other was needed.

We, also, think the tenth instruction should have been modified if given at all. In the shape it now stands its probable effect would be to excuse Mr. McElroy from giving in his greenbacks, because they were non-taxable, but the gold that was in his possession, and under his control, and over which he exercised ownership, *in paying* it out, and *adding to* it, was taxable, and if any such comment was made, the law of taxation as to all of the money should have been given, but it was not, in our opinion, a question of law arising in this case. As to whether Mr. McElroy's evidence should be affected by his failure to give in that gold to the assessor, the jury were entirely competent to determine for themselves without any instruction whatever.

We find no reversible error in the record save the refusal of the continuance, and under all the circumstances we think the court committed error in that regard. While it is essential to the welfare of the state, and well being of society that crime should be punished, it is equally important that the securities of individual rights should also be vigilantly guarded. The judgment is reversed and the cause remanded for a new trial. BURGESS and SHERWOOD, JJ., concur.