THE STATE v. PAUL H. KAUFFMAN, Appellant.—46 S. W. (2d) 843.

Division Two, February 17, 1932.

814

*S. R. Stone* and *J. B. McFarland* for appellant.

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent.

818

COOLEY, C.—Defendant, Paul H. Kauffman, was convicted in the Circuit Court of Jackson County of murder in the first degree for the killing of Avis Woolery. The jury assessed his punishment at death. After an unavailing motion for new trial he was sentenced in accordance with the verdict and has appealed.

The evidence offered by the State tended to show the following: Avis Woolery, the deceased, was seventeen years of age at the time of her death, August 17, 1930. She had resided with her mother and step-father at Webb City, Jasper County, Missouri. The defendant had been born and reared in Pennsylvania. At the outbreak of the late war he, then seventeen or eighteen years of age, had enlisted in the United States army, in which, after preliminary training in this country, he was engaged in active service abroad until the close of the war, when he was honorably discharged. Returning to his home he remained there for a time, then left and seemingly wandered about for a number of years, and finally came to Kansas City, Missouri, not long before the tragic events here involved. His whereabouts and movements during the time between his leaving his boyhood home and his arrival in Kansas City do not fully appear, nor do they appear to be material.

The testimony disclosed that defendant inserted in a Kansas City newspaper an advertisement for a white girl, sixteen years of age, to care for a child in a good home. Deceased's mother read the advertisement, bought deceased a ticket to Kansas City, and put her aboard a train at Webb City bound to Kansas City on the night of August 16, 1930, which was the last time the mother saw her daughter alive. Avis arrived at the Union Station in Kansas City on the morning of August 17, and by a friend was shown to the matron's desk in the station, where she was presently met by defendant, who represented himself as the person who had inserted the advertisement in the paper. According to defendant's confession, he took Miss Woolery to a secluded spot in Swope Park, where, after unsuccessfully soliciting her consent to sexual intercourse, he "attacked" her, she resisting, and in the course of the struggle that followed he strangled her to death. He did not say he choked her with his hands, but said he had his arm or elbow pressed against her throat

in the struggle, did not mean to kill her and did not know he had done so until she had ceased to struggle and he discovered she was dead. He thereupon carried her to a place nearby where a hole had been left in the ground by the uprooting of a tree, removed all the clothing from her body, tied her stockings tightly about her neck, placed the body in the hole and covered it with earth. He threw her suitcase, handbag, clothing and such other personal effects as she had carried, along the bank of the Blue River nearby, first removing from her handbag the small sum of money it contained, about seventy cents, which he kept. He then returned to the city. This occurred on Sunday. It was shown that on that evening or the next day he sent a telegram to deceased's mother, in deceased's name, stating: "Arrived safe, satisfied, write later."

Some time later defendant was arrested and lodged in jail on another charge. While he was so held the skeleton of a human body was discovered in Swope Park on October 12, 1930, in the hole above mentioned. The body was badly decomposed, but doctors were able to and did testify that the skeleton was that of a young adult person, sex undetermined. Some tufts of hair yet adhered to the scalp, and a pair of stockings was tied about the neck. After considerable questioning defendant confessed, writing his confession in full himself, and then voluntarily went with officers to Swope Park and pointed out the spot where he had killed Miss Woolery and where and how he had buried the body and told where he had thrown the clothing and effects of the dead girl. He also gave further details of what had occurred. Guided by the information thus received officers searched for and found the clothing and other effects above mentioned, which at the trial were definitely identified by deceased's mother as the clothes worn by deceased and articles in her possession when she boarded the train at Webb City on leaving there for Kansas City the night of August 16. The mother also identified the hair as that of deceased, and the stockings as those deceased had worn when she left Webb City.

The defense interposed by defendant was that of insanity. He did not himself testify. He introduced depositions tending to prove that as a child and youth up to the time of entering the army he had been of good character, intelligent and in every way of good promise, but that after his return and while he remained at his former home he was markedly changed. He would have periods of abstraction and apparent moroseness, melancholy, seeming to seek solitude, sometimes failing or refusing to recognize his best friends, was restless, showed lack of affection for his parents, and at one time chased his landlady about the house with a large knife and then, after an hour or so of voluntary solitude in the basement, reappeared, apparently normal, and laughingly said he had been joking. Other eccentricities

were testified to in the depositions, and that he often complained of severe headaches. There was some evidence indicating that he had syphilis while in the army. Other facts relative to the defense of insanity will be given in our discussion of the court's refusal to grant a continuance, one of the points stressed on this appeal. The foregoing is a general outline of the facts.

I. Appellant's first assignment of error is the refusal of the trial court to grant him a continuance to the next term of the court. The indictment in this case was returned October 15, 1930, at the September term of the court. Defendant was then in custody. The offense was not bailable and he would have been unable in any event to give bail. He was without funds and had no friends or relatives nearer than his former home in Pennsylvania. His relatives were unable to employ counsel for him. The court appointed Messrs. S. R. Stone and J. B. McFarland, young men then recently admitted to the bar, to defend him. It is but just to these attorneys to state that they have discharged well and with commendable fidelity and industry the onerous duty thus imposed upon them. The defendant was arraigned and entered a plea of not guilty on October 16, and the court then set the case for trial for October 22. On October 20 the court appointed another attorney to assist in the defense, but it does not appear from the record that said attorney at any time took part or assisted in the defense. On October 22, the day originally set for the trial, defendant filed application for a continuance to the next term of the court, beginning November 10, 1930, in order that he might procure the attendance or depositions of witnesses in support of his defense of insanity, and to give his counsel reasonable time to prepare the defense, it being alleged that they had not had adequate time. The application named nine witnesses whose testimony was desired, eight of whom lived at Columbia, Pennsylvania, defendant's former home, and one, Captain Eaton, at Watertown, Connecticut. One of those living at Columbia was Dr. Mann who had treated defendant professionally after he returned from the war. According to the application, Dr. Mann's testimony would tend to show that defendant's mind was deranged after his return, but defendant could not state all that the doctor would testify because the latter had not disclosed to him in full the results of his diagnosis. The application stated that Captain Eaton had served with defendant overseas, set out what he would testify to concerning the nerve-wracking experiences defendant had had and that the latter had suffered from gas and shellshock, at one time having been stunned and rendered unconscious for a time by a bursting shell, facts no other witness could testify to. The court refused to continue the case to the November term,

but reset it for October 29 and arrangements were made to take the depositions of the witnesses. An assistant prosecuting attorney went to Pennsylvania to represent the State, and the American Legion arranged with an attorney at Columbia, Pennsylvania, to represent defendant in the taking of the depositions. Defendant's counsel were not provided with funds to enable them to go.

The depositions of six of the witnesses named in defendant's application of October 22 were taken on October 25 and reached the clerk of the court in which the case was pending on October 27 or 28, but defendant's counsel were not able to get possession of them until the 29th and had no opportunity to examine them until after the empaneling of a jury to try the case had begun. The depositions of Dr. Mann and Captain Eaton had not been taken. In their brief here appellant's counsel say that it had been understood on the 22nd that Captain Eaton's deposition would be taken and that they did not know it had not been taken until they were given the opportunity to examine the depositions on the 29th. Be that as it may, it is clear that defendant's counsel had no opportunity to learn the contents of the depositions or to study them or to consult with a doctor or alienist concerning the facts therein shown prior to the calling of the case for trial on October 29.

In that situation defendant, on October 29, presented another application for continuance to the November term. It set forth the facts above stated relative to the taking of the six depositions, that defendant's counsel had not been permitted to have or to see them so as to familiarize themselves with the testimony therein contained; and further, that owing to the short time and defendant's lack of funds, his counsel had been unable to employ a physician or to procure one to examine defendant as to his mental condition until noon of the 28th, when Dr. E. H. Bullock of Kansas City finally consented to examine defendant and testify as to the results of his examination; that the officers in charge of defendant had refused Dr. Bullock permission to see or to examine defendant without a court order to that effect, and that defendant's counsel, though they had made diligent efforts, had been unable to find or to communicate with the judge of the court and obtain such order on the 28th, resulting that Dr. Bullock had not been able to make the examination; that more time was necessary for said physician properly to examine and observe defendant in order to be able to testify as to his condition; and that defendant's counsel reasonably required more time in which to familiarize themselves with the depositions and properly to prepare the defense. The facts stated in this second application were not controverted. The depositions were delivered to defendant's counsel on the morning of the 29th when they filed said second application for continuance. The court overruled said application,

ordered the case to trial and proceeded to empanel a jury. Defendant saved exceptions to the court's ruling. The court at the time of denying the continuance made an order that Dr. Bullock be allowed to examine the defendant that day. The first opportunity for such examination as well as for defendant's counsel to read the depositions was during the noon recess of the court that day, when Dr. Bullock examined the defendant for about thirty minutes.

Defendant introduced the depositions at the trial and called as a witness Dr. Bullock who sufficiently qualified as an expert. The testimony of the latter fully confirmed the contention made in defendant's application for continuance that more time was required for examination and observation of defendant before a conclusion could be reached as to his mental condition. Dr. Bullock testified that he obtained from defendant his history, which included indications that he had had syphilis; that he discovered scars of previous sores on defendant's privates; that if defendant had a syphilitic infection it might affect his nervous and mental condition and might produce a condition such that defendant at times would not know right from wrong, depending upon "the severity of the case;" that from the brief examination he had been able to make he had been unable to form an opinion as to whether or not defendant was insane when he committed the act charged; that in order to form an intelligent conclusion as to whether or not there was a syphilitic infection it would be necessary to make blood tests, spinal tests "and other tests," and to determine defendant's mental condition would require examination and observation of defendant over a period of time; and in effect that it was impossible without further observation to determine defendant's mental condition. He said: "We observe these mental cases over long periods of time and watch them closely, and no physician can come to a conclusion immediately on just examining a man."

It is well settled, as contended by the State, that an application for continuance is addressed to the sound discretion of the trial court, with the exercise of which we will not interfere unless it appears from all the facts and circumstances that such discretion has been abused to the prejudice of the defendant. As said in State v. Wade (Mo. Sup.), 270 S. W. 298:

". . . only in unusual cases will this court interfere. . . . We are reluctant to adjudge reversible error on account of a ruling of this kind. The reported cases will show that this court has seldom reversed a case on account of such a ruling (refusal to grant a continuance)."

But it is equally well established that this discretion of the trial court is reviewable on appeal, and that the refusal of a continuance is ground for reversal if the continuance was improperly refused.

[State v. Wade, supra, and cases cited.] The propriety of granting or refusing a continuance depends much upon the peculiar facts of each case. [State v. Maddox, 117 Mo. 667, 681, 23 S. W. 771.] For instructive cases in which the refusal of a continuance was held reversible error see State v. Wade, supra; State v. Maddox, supra; State v. Maguire, 69 Mo. 197; State v. Wood, 68 Mo. 444; State v. Lewis, 9 Mo. App. 321, affirmed in 74 Mo. 222; State v. Hesterly, 182 Mo. 16, 81 S. W. 624, 103 Am. St. 634.

In the instant case, in view of the gravity of the charge, the nature of the defense tendered, the defendant's friendless and penniless situation and all the facts and circumstances above pointed out, we are constrained to hold that the learned trial court erred in refusing to grant the continuance to the next term as prayed by defendant. It would have involved but a short delay. Defendant was charged with a heinous offense, one that naturally arouses the abhorrence of decent men. His life was at stake. His only defense was insanity, a defense which we can understand and which the testimony of Dr. Bullock tends to show might reasonably require more time for the most experienced counsel properly to prepare for presentation to a jury than was allowed. Even in a civil case a defendant would hardly be forced to trial with so little time and opportunity to prepare his defense. Where a human life is at stake every sentiment of humanity and justice demands that the accused be given reasonable time and opportunity to prepare such defense as he may have. Defendant may be as guilty as the State claims, yet if so we may well say, as was said by this court in another case wherein the defendant was charged with an atrocious crime, ''so much the more does he deserve a fair trial, lest the whip and scorn of our abhorrence shall drive us to mob him under the guise and empty shell of justice.'' [State v. Guerringer, 265 Mo. 408, 419, 178 S. W. 65, 68.]

II. Appellant complains of the instructions, particularly of No. 3, and that the court should have instructed on murder in the second degree and manslaughter. We think the evidence did not call for an instruction on manslaughter. By Instruction No. 2 the court submitted the case on the theory of a murder committed premeditatedly and with deliberation, but without reference to a homicide committed in the perpetration of or attempt to perpetrate rape. Instruction No. 3 was in part as follows:

''The court instructs the jury that the indictment on which the defendant is tried charges him with murder in the first degree.

''Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, and every homicide which shall be committed in

the perpetration or attempt to perpetrate any arson, rape, robbery, burglary or mayhem, shall be deemed murder in the first degree.

" 'Willfully,' means intentionally, not accidentally.

" 'Deliberately,' means done in a cool state of the blood. It does not mean brooded over or reflected upon for a week, a day or an hour, but it means an intent to kill executed by the defendant in a cool state of the blood, in the furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose, and not under the influence of a violent passion suddenly aroused by some lawful or just cause or provocation."

The remainder of the instruction merely defines the terms "premeditatedly," "malice," and "malice aforethought," and need not be quoted as no point is made that those terms are not correctly defined.

(a) There was no instruction submitting the case on the theory of a homicide committed in the perpetration of or attempt to perpetrate rape, the theory on which the State's case really proceeded, unless Instruction No. 3 was meant to submit that issue. The evidence justified and called for an appropriate instruction submitting that issue. While defendant in his confession and oral statements nowhere used the word rape or ravish he did say he "attacked" deceased and in her struggle in resisting him she was killed. The word "attack" does not necessarily mean ravish but used as it was in connection with the circumstances shown it could reasonably have been understood and doubtless was intended to be understood as meaning that he ravished or attempted to ravish her. However, if the court intended to submit the case only upon the hypothesis of a murder committed premeditatedly and with deliberation, disregarding the hypothesis of homicide committed in the perpetration of or attempt to perpetrate rape, then we think the instructions, in order fully to present the law, should have included an instruction on murder in the second degree. While we think there were sufficient circumstances shown, including defendant's statements and confession, to authorize a finding, if believed by the jury, of premeditated and deliberate murder, the defendant said in those statements and confession that the killing was not premeditated, that he had not intended to kill deceased. The jury, of course, was not obliged to believe that statement though included in a statement proved by the State. But it was privileged to accept it and if it did then the defendant should not have been found guilty of murder in the first degree unless the jury found that the homicide was committed in the perpetration of or attempt to perpetrate rape.

(b) Instruction No. 3 cannot be sanctioned. It quotes the entire statutory definition of murder in the first degree without in any way applying it to the facts proved, leaving it to the jury to draw

their own conclusions and make their own application of the statute. There was no evidence of a murder or homicide committed in several of the ways defined in the statute and in the instruction. The jury might have concluded, even, that if defendant killed deceased in the course of an unlawful attack upon her short of a rape or attempt to commit rape it would constitute murder in the first degree without further proof of deliberation. Instructions should declare the law applicable to the facts given in evidence and not give the jury a "roving commission" as this instruction obviously does. Care should also be taken on another trial so to frame the instruction defining deliberation, if one is given, that it is not susceptible of being understood to mean that homicide is deliberate, therefore murder in the first degree, merely because committed "to accomplish some other unlawful purpose,"—other than rape in this case. See State v. Sharpe, 326 Mo. 1063, 34 S. W. (2d) 75; State v. Hershon, 329 Mo. 469. Instruction No. 3, as given, was clearly erroneous. Such an instruction is liable to be confusing and misleading. We cannot say, as we are urged to do, that it was not prejudicial.

III. Instruction No. 4 on insanity is criticised, the criticism being leveled at the first and last paragraphs. The instruction reads as follows:

"The court instructs the jury that the defendant interposes the plea of insanity as a defense in this case; such defense is one recognized by the law, and it is for you to determine from all the evidence the validity or invalidity of this or any defense interposed.

"'Insanity' is a physical disease, located in the brain, either partial or general, which perverts and deranges one or more of the mental or moral faculties, so far as to render a person suffering therefrom incapable of distinguishing right from wrong in reference to the particular act charged against him, and incapable of understanding that the particular act in question was a violation of the law of God and of society.

"Therefore, if you believe from the evidence that the defendant at the time of the alleged choking and strangling, if any, was so perverted and deranged in one or more of his mental and moral faculties, as to be incapable at that time of understanding that such choking and strangling, if any, was wrong and in violation of the law of God and of society, you should acquit him upon the ground of insanity.

"On the other hand, in order for you to hold defendant criminally responsible as against the plea of insanity, it is only necessary that you should be satisfied, from all the evidence, that he had sufficient

mental capacity to distinguish right from wrong as to the particular act charged against him; and if you believe that the defendant, at the time of the choking and strangling, if any, had such degree of mental capacity as to enable him to distinguish between right and wrong in reference to the act charged against him, and to know that said act was criminal and wrong and would deserve punishment, then in law he had a criminal intent and was not so insane as to be exempt from the responsibilities of such act.

"And in this connection, you are further instructed that excitement or frenzy arising from passion or anger, hatred or revenge, no matter how furious, if not the result of a diseased mind, would not constitute legal insanity, and the jury should not confuse excitement, anger or wrath, or acts done under the influence of either or both, for the purpose of revenge, with actual insanity, such as is recognized by law."

It is contended that the first paragraph of the instruction leaves, or might be understood to leave, it to the jury to determine whether or not insanity is to be treated in this case as a "valid," that is, *legal* defense, instead of directing clearly that the law recognizes it as a valid defense which is to be allowed if the jury find that insanity has been established by the evidence. Though clear enough to a lawyer a juror might possibly so misinterpret that part of the instruction.

The concluding paragraph is assailed on the ground that it assumes or at least implies the existence of facts not in evidence and in effect improperly singles out and comments on certain phases of the evidence. We are inclined to think the evidence did not authorize a finding that the homicide might have been committed through a feeling of hatred or revenge. Defendant's confession does indicate that he was under the influence of excitement and passion. He says in one place: "In my drunken passion I didn't realize she was slowly choking to death."

Since the case must be remanded on other grounds we need not determine whether or not the matters complained of in the instruction render it prejudicially erroneous. We suggest that on another trial the instruction be modified so as to remove the above mentioned grounds of objection.

IV. Complaint is made of the main instruction, No. 2, which submits the case on the theory of deliberate murder. The complaint is that the instruction directs a verdict of guilty if the jury finds that defendant "did clasp and choke the throat and neck of Avis Woolery with his hands and by other means, if any," etc., and thus and thereby choked and strangled her to death, whereas it is contended that the evidence does not authorize a finding that defendant choked deceased *with his hands*. In defend-

ant's written confession he said that as he held Miss Woolery his elbow was resting on her throat. It was in that connection he added: "In my drunken passion I didn't realize she was slowly choking to death." A witness testified that in describing verbally how he killed deceased he said that in trying to hold her down he had his arm across her throat. It is not claimed that the evidence fails to show that defendant used his hands in the struggle with deceased and that he choked and strangled her to death, but only that it does not show that he clasped her throat with his hands. We think this criticism of the instruction is hypercritical. Defendant could not have been prejudiced by the inaccuracy complained of.

V. Some contention is made that there was not sufficient proof of the *corpus delicti* independent of defendant's confession. The *corpus delicti,* which in a murder case consists of a showing of the death of the person alleged to have been murdered and that the death was caused by the criminal agency of some one other than the deceased (see State v. Joy, 315 Mo. 7, 19, et seq., 285 S. W. 489, 494 et seq.), may be proved by circumstantial evidence. [State v. Henderson, 186 Mo. 473, 483, 85 S. W. 576; State v. Smith (Mo. Sup.), 44 S. W. (2d) 45, and cases cited.] Full proof of the *corpus delicti* independent of the confession is not required.

"If there is evidence of corroborating circumstances which tend to prove the *corpus delicti* and correspond with circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the *corpus delicti* is sufficiently proved in a given case." [State v. Skibiski, 245 Mo. 459, 463, 150 S. W. 1038.] See also State v. McGuire, 327 Mo. 1176, 39 S. W. (2d) 523, and cases cited.

Without further reviewing the facts it is enough to say that the *corpus delicti* was sufficiently proved.

VI. Error is alleged in the refusal of the court to sustain defendant's challenge for cause of certain jurors; that witnesses were used by the State of the endorsement of whose names on the indictment defendant had not been given notice; and that a new trial should have been awarded because of newly discovered evidence. As these alleged grounds of complaint will not likely arise on another trial they need not be discussed.

The judgment of the circuit court is reversed and the cause is remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.