[1] This appeal is from a conviction on a charge of violating an ordinance of the City of St. Louis, Missouri. An information was filed in City Court No. 1 of said city charging that defendant Morris Washington on the 3d day of September, 1947, in the City of St. Louis and State of Missouri, at 237 South Jefferson "did then and there make, establish and aid or assist in making and establishing a lottery, gift and enterprise and scheme of drawing in the nature of a lottery. (Policy)."
[2] Upon a trial in said City Court defendant was found guilty as charged and his punishment assessed at a fine of $100 and costs. Defendant appealed to the St. Louis Court of Criminal Correction where a trial before the court resulted in a judgment exactly similar to the judgment rendered in said City Court. From the judgment of the Court of Criminal Correction defendant appealed to this court.
[3] Prior to the commencement of the trial in the Court of Criminal Correction defendant filed a motion to suppress evidence in which he alleged that police officers of the City of St. Louis had in their possession certain evidence in the nature of alleged top sheets, take sheets, policy result ballots, policy notebooks and other paraphernalia which was intended to be used against defendant in the trial. Defendant also alleged in said motion that said evidence was obtained by a search and seizure before defendant's arrest; that at the time of such search and seizure said officers had no warrant for the arrest of defendant and that said search and seizure were unreasonable, illegal and violative of Sections 15 and 19 of Article I of the Constitution of the State of Missouri, Mo.R.S.A., and that to permit the use of said evidence would be compelling defendant to give testimony against himself.
[4] Testimony on defendant's motion to suppress evidence was heard before the court, at which hearing Robert Griffin, a police officer who was a member of the Secret Service Gambling Division of the Police Department of the City of St. Louis, testified that on the day in question he went to the building in which defendant claimed to live. The witness stated: "There are a lot of tenants in the same building," that the part of the building into which he went was not Washington's home. The witness further testified that he and his associate officer had seen the same persons going in and out of the building at 12 noon and 5 P.M. and 9 P.M., and that they had had the place under surveillance for about a week; that they had no search warrant but that he and his partner entered the front door of the building, which was used as a common entry by the tenants, and together they entered a hall about 25 feet long; that there was a door standing open and they could hear voices of persons coming from the basement and they descended the stairs to the basement about 15 steps, *Page 860 
and as they stopped on the stairs, they looked into the basement and saw a group of individuals who had policy papers seated around on some benches and chairs; that he was then only a few feet away and looked in the basement and saw the defendant Morris Washington seated at a table and on the table before him were policy papers, policy books and some policy drawings; that defendant Washington was then searched; that on the table where defendant Washington was seated there were policy papers, the take book containing the original sheets and two carbon copies and a play 2099 and No. 5 and the records from ten policy books amounting to $28.90 and twelve policy original top sheets; that from the person of defendant Washington he took $28 in currency, one policy tab and an original policy book, policy tab 209.
[5] Further testimony was given by Officer Griffin with respect to other individuals who were arrested at the same time as defendant Washington, the court having stated that it would hear evidence on the motions to suppress filed in the other cases involving similar charges against other defendants then pending before the court. This was done without objection from either party. The defendants in the other cases, who were convicted and whose appeals were argued along with this appeal in this court, were Joe Simon and Roy Ward. Each of said defendants was charged in a separate information filed in the same court with violation of the same city ordinance on the same day and at the same time and place as was charged in the information filed in this case against Morris Washington. Officer Griffin further testified that when he entered the building at the time in question he had an idea whom he would run into. The court overruled defendant's motion to suppress evidence and then heard the case on its merits.
[6] Police Officer Griffin continuing with his testimony stated that at the time of the arrest of defendant Washington and the others heretofore mentioned, one Edward Andrew was questioned and stated that Washington was the policy manager and that he, Andrew, was turning in his books to Washington. Defendant objected to the testimony concerning the statement made by Andrew but did so after the testimony was given. The witness repeated in detail the testimony he had given on the hearing on the motion to suppress evidence which, it will be recalled, related to the entry by the officer and his partner into the building and into the room where defendant and the others referred to were at the time of the arrest.
[7] Officer Griffin testified at length, describing the game of policy and its operation, stating that it is a means of gambling by betting money on certain numbers that will be drawn in a lottery; that the lottery result ballot is a slip of paper which has three columns of numbers on it, one column having 12 numbers known as the policy column short side; that the center column has six numbers known as the Cyclone and the third column twenty numbers known as the Bungaloo; that on the top of the result ballot is the number known as the class number which identifies the drawing as being held; that the result ballot has been prepared by the operator of the lottery who selects the number of his own choice to print on the result ballot; that there are any number of individuals who play policy; that the policy writers go out on the street and make contacts; that if anyone wished to play policy he would see the policy writer and tell him the numbers he was selecting on which he wanted to make a bet; that the bettor could select various combinations of numbers to bet on; that the policy writer would write in his policy book the numbers selected and the amount of money bet thereon; that City's Exhibits Nos. 1 and 2, which were introduced in evidence, were such policy books.
[8] Officer Griffin further describing the game of policy stated that after the policy writer takes the money for betting and records it the drawings take place at designated hours and the policy writer reports into the meeting where he meets the manager and he turns in his original top sheet and carbon copies of the originals with the money he has accepted as bets; that the top sheet is the original sheet having the *Page 861 
original recording of the bet; that he writes those top sheets from his policy book; that he turns into the manager the original top sheet and one carbon copy sheet; that the manager retains as his record the carbon sheet and sends in to the company the original top sheets; that after all of the policy writers make these returns into the manager there is a man known as the pickup man who contacts the different managers and picks up from them the top sheets for a drawing and then the pickup man goes to designated spots where he meets the operator of the policy company or a man working for the operator and the pickup man then gives to the company man the top sheets and the company man, in turn, gives the result ballots to the pickup man; that the pickup man goes back and re-contacts the persons with whom he is dealing and gives them the result of the drawing and those result ballots are the numbers that have been drawn.
[9] Officer Griffin was asked: "Q. And assuming that I had made there a certain combination of numbers that appears in the result ballot then I would win some certain amount of money, is that correct?" He gave the following answer: "A. If the numbers you selected to bet on appears in or on the result ballot in the column in which they are designated there as having been paid then you would win."
[10] The Assistant City Counselor questioned Officer Griffin as to whether defendant Washington had made a statement at the time of his arrest. This question was objected to on the ground that any such statement would be inadmissible for the reason that the corpus delicti had not been established. The objection was overruled by the court and Officer Griffin testified that defendant Washington stated that he "had been manager in No. 5 for the Royal Policy Company" and that he had been working for that company as manager for about a year; that he was paid a commission of 5% of the gross take; that defendant Washington explained that that was the amount of the bet which each writer had turned in to him and that he got 5% of that; that his average earnings was about $25 a week; that as to the policy meet at 237 South Jefferson in the basement he had been meeting in that basement for the past two months and previous to that time had been meeting the writers on the street; that the Royal Policy Company had three drawings daily, one at 12 noon, one at 5 P.M. and one at 9 P.M. and two drawings on Sunday, one at 12 noon and one at 8 P.M.
[11] Officer Griffin further testified that at the time of the arrest of defendant Washington and the others mentioned he found on the table in front of Washington besides the two policy books heretofore mentioned twelve carbon copy sheets out of some policy writer's book. They were marked City's Exhibit 3 and the original top sheets were marked City's Exhibit 4. With reference to the policy memorandum found on the defendant Washington at the time of the arrest, Officer Griffin testified that it referred "to some money that is due the company by one of the writers, the writer of book No. 21, of $6.55 due the company, and cash was paid in the amount of $3.05, and due is $3.50."
[12] Further testimony by Officer Griffin was to the effect that defendant Washington stated that the policy manager's take book which was on the table in front of Washington at the time of the arrest had the recordings therein; that Washington pointed to the figures on the left hand side of the book and explained that was the policy writers' book numbers and that several book numbers that appeared there record the take in the policy that had been turned in to him for the drawing that day and that defendant further said that the class drawing of the number being held at noon that day was 2099.
[13] Upon cross-examination Officer Griffin testified that at the time of entering the building on Jefferson Avenue where defendant and the others were arrested he had no search warrant or warrant for anyone's arrest; that defendant and the other persons in the basement at the time were engaged in a general conversation about policy. The witness was not able to identify the handwriting on any of the City's exhibits, and testified that the information he had acquired as to who had written on *Page 862 
the exhibits was acquired after the arrest by the statements of the various defendants, and that he saw no money change hands in the basement at the time.
[14] The City introduced in evidence the City Ordinance on which the charge was founded. It also put in evidence the various papers, books, sheets and copies which the officer had identified as having been seized in the room at the time of the arrest, and also introduced the papers and books taken from the defendant, all pertaining to the game of policy.
[15] Defendant contends that the court erred in refusing to sustain his motion to suppress the evidence and argues that the evidence in support of his motion proved that the search of the defendant and the seizure of the evidence were unreasonable and violative of defendant's constitutional rights and that the officer, therefore, had no right to search him or to seize evidence which he had in his possession at that time. We are unable to agree with defendant's views on this point.
[16] At first glance defendant's contention may appear to raise a constitutional question of which our Supreme Court under Article V, Section 3 of the Constitution of Missouri would have exclusive jurisdiction on appeal. Said section of the Missouri Constitution provides: "The supreme court shall have exclusive appellate jurisdiction in all cases involving the construction of the Constitution of the United States or of this state * * *." However, our Supreme Court has held that the right of arrest by police officers in the City of St. Louis under Section 7691, R.S.Mo. 1939, Mo. R.S.A. § 7691 is lawful when the police officers have reasonable grounds to believe that an offense against the law has been committed by the person arrested. State v. Humphrey, Mo.Sup., 217 S.W.2d 551, 553. To the same effect are Hanser v. Bieber, 271 Mo. 326, 197 S.W. 68; Wehmeyer v. Mulvihill, 150 Mo.App., 197, 130 S.W. 681; Commission Row Club v. Lambert, Mo. App., 161 S.W.2d 732. See also City of St. Louis v. Gavin, Mo.App., 222 S.W.2d 536, and City of St. Louis v. Gavin, Mo.App., 222 S.W.2d 531, in both of which cases opinions were handed down by this court on June 21, 1949. Furthermore, it has been held by our Supreme Court that where the arresting officer has reasonable grounds to believe the person arrested has committed an offense against the law, the officer may take from him articles of value as evidence. State v. Raines, 339 Mo. 884, 98 S.W.2d 580; State v. Williams, 328 Mo. 627, 14 S.W.2d 434; State v. Humphrey, Mo.Sup., 217 S.W.2d 551.
[17] It has also been held in numerous cases by our Supreme Court that when that court has once determined the precise constitutional question raised in a case wherein the courts of appeals would otherwise, absent such constitutional question, have jurisdiction, the Supreme Court will not thereafter assume jurisdiction of the cause on account of the constitutional question mooted. Dickey v. Holmes, 208 Mo. 664, 106 S.W. 511; Turner v. Tyler Land Timber Co., 259 Mo. 15, 167 S.W. 973, 975; State v. Finley, 259 Mo. 414, 168 S.W. 921; State v. Swift Co., 270 Mo. 694, 195 S.W. 996.
[18] On the record now before us and under the decisions of our Supreme Court, supra, we hold that no constitutional question is involved and that this court has jurisdiction of the appeal.
[19] We are of the opinion that under the evidence shown herein the police officers had not only reasonable grounds but had clear, strong grounds for believing that defendant was engaged in violation of the law at the very time of his arrest. From the description of the game of policy given by Officer Griffin it is obvious that the game is not conducted by one person alone but by several persons, each of whom is a necessary link in the chain used to carry on the game. The lawmakers undoubtedly, knowing that no one person alone establishes or conducts the game, made it an offense for anyone to "make or establish or aid or assistin making or establishing any lottery, gift or enterprise, or scheme of drawing in the nature of a lottery." (Emphasis ours.) Ordinance of the City of St. Louis No. 41386, Section 1677. See State v. Wilkerson, 170 Mo. 184, 70 S.W. 478. *Page 863 
[20] The police officers not only had reasonable grounds to arrest defendant and his associates but in our opinion would have been derelict in their duty had they not done so under the circumstances shown in the evidence. The defendant and his associates were actually "caught in the act" of violating the law. The police officers, being familiar with the surreptitious manner in which the game of policy is carried on, saw overwhelming evidence before their eyes of the fact that defendant was at the very moment of his arrest aiding and assisting in carrying on the game of policy. It is unnecessary to repeat that evidence here. The arrest of the defendant without a warrant was, therefore, a lawful one, and under the decisions of our Supreme Court, supra, it follows that the search of defendant's person and the seizure of the evidence mentioned also were lawful.
[21] The numerous cases cited by defendant on this point have no application to the situation before us. We hold that the court did not err in overruling defendant's motion to suppress the evidence.
[22] Defendant next contends that the court erred in admitting into evidence testimony as to a statement made by Edward Andrew at the time of defendant's arrest. As we have heretofore shown, the testimony of Officer Griffin relating what Edward Andrew had stated had already been given before the objection thereto was made. The objection, therefore, came too late, and since there was no motion to strike out said testimony, nor was any request made to disregard it, we must rule this point against defendant. Mauck v. Atchison, T. S. F. R. Co., Mo.Sup., 154 S.W.2d 73, and Wolfson v. Cohen, Mo. Sup., 55 S.W.2d 677.
[23] Defendant makes the further point that the court erred in admitting into evidence the testimony of Officer Griffin as to certain admissions made by defendant at the time of his arrest for the reason that the corpus delicti had not been established. It will be recalled that Officer Griffin testified that defendant Washington stated that he had been manager in "No. 5 for the Royal Policy Company" and that he had been working for that company as manager for about a year and that the defendant went into considerable detail in his statement to the officer concerning his activities for the Royal Policy Company all of which showed beyond question that the defendant was at the time of his arrest engaged in aiding and assisting in the conduct of the game of policy.
[24] In the case of State v. Skibiski, 245 Mo. 459, 463, 150 S.W. 1038, 1039, our Supreme Court said: "The rule in this state has long been that full proof of the corpus delicti, independently of the confession, is not required. If there is evidence of corroborating circumstances which tend to prove the corpus delicti and correspond with circumstances related in the confession, both the circumstances and the confession may beconsidered in determining whether the corpus delicti is sufficiently proved in a given case." (Emphasis ours.) The rule in the Skibiski case, supra, applies with equal force to statements made by a defendant as well as to confessions. See State v. Mullinix, 301 Mo. 385, 257 S.W. 121; State v. McGuire, 327 Mo. 1176, 39 S.W.2d 523; State v. Kauffman, 329 Mo. 813,46 S.W.2d 843; State v. Knowles, 185 Mo. 141, 83 S.W. 1083. See also State v. Arndt, Mo.Sup., 143 S.W.2d 286, 287, where the Supreme Court quoting from State v. Thompson, 333 Mo. 1069, 64 S.W.2d 277, 282, said: "The rule in this state is that full proof of the corpus delicti independent of the defendant's extrajudicial admissions is not required. On the contrary, what seemed to be only slight corroborating facts have been held sufficient. State v. McGuire, 327 Mo. 1176, 39 S.W.2d 523. Neither is it essential that all the independent proof of the corpus delicti came first in order of proof. 7 R.C.L. § 6, page 778; 16 C.J. § 1514, page 737."
[25] The overwhelming evidence of the defendant's participation in aiding and assisting in the conduct of the game of policy which the police officers found upon entering the room in the basement mentioned, together with defendant's own statements as to the part he was playing in the *Page 864 
game, were amply sufficient to justify the court in admitting the statements objected to by the defendant. We hold that the court did not err in admitting the evidence of the statements in question.
[26] Defendant next contends that the court erred in failing to sustain his motion for dismissal of the charge at the close of the City's case on the ground that the City had failed to make a case against him. This general complaint against the action of the court is not supported by any authorities in defendant's brief and is completely answered by what we have heretofore said in relation to the overwhelming proof that was shown of defendant's participation in the conduct of the game of policy.
[27] We hold that the evidence was amply sufficient to justify defendant's conviction and no error having been shown in the procedure, the judgment of the Court of Criminal Correction is affirmed.
[28] ANDERSON, P. J., and HUGHES, J., concur.