THE STATE v. ANDREW B. MEADOWS, Appellant.—51 S. W. (2d) 1033.

Division Two, July 1, 1932.

*Herbert H. Blair* for appellant.

1022

*Stratton Shartel,* Attorney-General, and *Edward G. Robison,* Assistant Attorney-General, for respondent.

COOLEY, C.—By indictment duly returned in the Circuit Court of the City of St. Louis, the defendant Andrew B. Meadows, Lewis E. Balson, Ralph Pierson and Robert H. Cotham were jointly charged with murder in the first degree alleged to have been committed on December 5, 1927, in the felonious burning of the Buckingham Hotel Annex wherein one May Frazer was alleged to have been burned to death—a murder committed in the perpetration of arson. At the request of some of the indictees a severance was granted and the State elected to try Meadows first. He was tried alone and on October 17, 1930, the jury returned a verdict finding him guilty of murder in the first degree as charged and assessing his punishment at death. From sentence and judgment upon the verdict he has appealed.

The facts are substantially undisputed except as to who actually set the fire. Defendant contended that while he had entered into an agreement with Cotham to aid in burning the building and assisted therein and received money for such assistance, as will hereinafter more fully appear, he did not himself set the fire. The Buckingham Hotel Annex was a hotel building four stories in height, used in connection with the Buckingham Hotel building proper. The evidence indicates that it was of such material and construction that it naturally would, and did, burn rapidly and that at all times it contained a considerable number of guests, most of whom were regular lodgers, facts well known to defendant. It was owned by Pierson and Balson who were in financial straits. A receiver had been appointed to take charge of their hotel properties, including the Annex, the properties had been advertised for sale and the sale was to occur about December 17, 1927. Cotham was a clerk in the Buckingham Hotel proper, situated across the street from the Annex. Meadows was night watchman at the Annex, a position he had held for several years prior to the fire. Among other duties he was required to make hourly inspection rounds of the Annex during the night. One evening about a month before the fire, which occurred about three o'clock in the morning of December 5, 1927, Cotham asked Meadows to meet him in the park the next morning, which Meadows did. Cotham then informed Meadows that the owners of the Annex were in bad financial condition and wanted to get someone to burn the Annex so that they could collect the insurance and that they would pay $10,000 to have it burned, half of which Cotham would give Meadows if the latter would burn the building. Meadows testified that he at first agreed to this proposition but on further thought told Cotham he would not set the fire because he feared some of the guests might be killed or injured but that he did agree to assist by omitting regularly thereafter to make his three o'clock inspection round so that someone else to be procured by Cotham could have opportunity to set the fire, Meadows to receive $5,000 for his participation, and that such was the arrangement finally agreed upon and carried out. When that agreement was reached Cotham advanced to Meadows $100. They discussed where the fire should be set so that it could get under good headway before being discovered and agreed that a good place would be a room, No. 137, on the second floor, which was used, except on rare occasions, only by the maids in changing their dresses. Cotham and Meadows had several conferences over a period of three or four days discussing the question of getting out the guests after the fire should be discovered and perfecting their plans. Pursuant to agreement Meadows thereafter refrained from making his three o'clock inspection round.

About 2:30 in the morning of December 5, after making his two o'clock round, Meadows went to the Buckingham Hotel where he saw Cotham. The latter said to him: "Well, everything is over tonight, and in fact I think it will be right along now," gave him some cigars and told him to keep quiet. Shortly before that, the same night, Meadows had looked into Room 137 to make sure there was no one there. After the above conversation with Cotham Meadows returned to the Annex and waited there until a guest occupying a room directly over Room 137 discovered fire coming from that room. An alarm was turned in and in due time members of the fire department arrived. The building burned rapidly and the greater part of the wing in which the fire originated was destroyed. May Frazer and several other guests lost their lives in the fire and several more were injured. The evidence leaves no doubt that May Frazer's death occurred in and was directly caused by the fire. After the fire had been discovered and the alarm given, defendant, with others, did what he could in arousing guests and aiding them to escape. At different times after the fire Meadows received various sums of money for his services in connection therewith from Balson, Pierson and Cotham, most of it from Cotham, aggregating some seven or eight hundred dollars.

The fact of the fire, its place of origin and progress, the arrangement of the building, etc., and the death of May Frazer therein and resulting therefrom, together with other circumstances relating thereto, were shown by evidence other than defendant's testimony or confession. Defendant's conspiracy with Cotham to assist in the arson, their conferences, their planning of the burning and the payment of money to defendant for his part therein, were testified to by defendant at the trial on direct as well as cross-examination. Although at the trial he denied actually setting the fire his testimony admitting and detailing the conspiracy and the part he played in carrying it out makes him legally guilty of the arson as though he himself had set the fire, if it was set pursuant to the conspiracy by Cotham or by someone procured by Cotham to do it.

Several months after the fire suspicion was directed to defendant and he was arrested. At first he denied knowledge of the origin of the fire but after being questioned at some length admitted the facts as to his knowledge of and participation in the arson as above outlined, claiming, however, when he first made such admission, that he had not actually set the fire. After further questioning he admitted that he had started it himself by setting fire to some papers in the drawer of a dresser in Room 137. His confession was then reduced to writing, signed by him and attested by witnesses. As written and signed it gave in detail the history of the conspiracy, its

consummation, the circumstances of the fire and the payments subsequently made to Meadows for his part therein. The only substantial difference in the material facts between the written confession and defendant's testimony at the trial was that in the confession he admitted that he himself had set the fire while in his testimony on the witness stand he claimed that he had not done so and did not know who had. The State introduced the confession in evidence, first having offered in the absence of the jury proof that it had been made voluntarily, which evidence was later given to the jury. The State's evidence on this question consisted of the testimony of all the officers who had participated in procuring the confession or were present when it was made, together with that of the subscribing witnesses who were called in to witness its execution. It showed that the confession was voluntary. Defendant at that time offered no evidence to the contrary and the confession was admitted. Defendant "objected to the introduction of this paper in evidence," but without stating any grounds or reasons for the objection. Later, when testifying as a witness in his own behalf, he claimed that while being questioned by the officers he learned from them that his wife and daughter were then being detained in the holdover and in effect that he was given to understand that they would not be released unless he changed his statement that he had not himself set the fire, and that he thereupon changed his statement and said that he had set the fire in order to procure their release. The testimony of the State's witnesses contradicted that of defendant on this point. Defendant made no claim of any other coercive or improper influence tending to induce the statement in his confession that he had set the fire.

I. The principal contention urged on this appeal is that there was not sufficient evidence *aliunde* the confession to prove the *corpus delicti* and that because of such insufficiency of the requisite proof of that fact the confession should not have been admitted and should not be considered. We have held in several recent cases that the *corpus delicti* in a murder case consists of proof of the death of the person alleged to have been murdered and that such death was caused by the criminal agency of some person other than deceased. [See State v. Joy, 315 Mo. 7, 19, 285 S. W. 489, 494; State v. Kauffman (Mo.), 329 Mo. 813, 46 S. W. (2d) 843, and cases cited.] Defendant contends and we think correctly that where the homicide is charged to have been committed in the perpetration of arson the *corpus delicti* is not proved by a showing only of a fire and the death of the deceased resulting therefrom, as on such showing alone the fact of criminal agency causing the death would not appear; for which reason there must be evidence tending to prove that the fire

which caused the death of the person charged to have been murdered was of incendiary origin. Defendant insists that without his extra-judicial confession there was not sufficient evidence that the fire in this case was of incendiary origin. To the latter contention we cannot agree.

We need not consider whether or not the State had made a sufficient showing of the *corpus delicti* when it closed its case in chief. Since defendant did not stand upon his demurrer offered at the close of the State's evidence, but offered evidence himself, including his own testimony, we see no reason why the rule that applies generally should not be applied here, viz., that the sufficiency of the evidence must be determined by the *whole* evidence in the case, including the testimony of the defendant if that or other evidence offered by him aids or supplies deficiencies in the case made by the State in its evidence. For that reason we have not set out in detail all the circumstances in connection with the fire as shown by the State's evidence, some of which might have a bearing upon the question of incendiary origin of the fire. Defendant's testimony affirmatively shows the conspiracy to burn the building, the motive therefor, the planning of the arson, the selection of the place where and the hour of night at which the fire should be set, the arrangement whereby defendant was to and did omit his three o'clock round in furtherance of the conspiracy, that he knew "there was going to be a fire," and that the fire originated in the room and at the time of night as planned. It further shows that on that night defendant looked into the room in question to assure himself, and doubtless his fellow conspirator Cotham, that it was unoccupied and that shortly before the fire was discovered Cotham told him it would all be over that night, "in fact right along now," obviously referring to the burning of the building which they had planned and about which they were then speaking. Defendant also testified to receiving money thereafter for his part in the arson pursuant to his prior agreement with Cotham. If the fire was not incendiary its cause was not shown by the evidence. Keeping in mind that the element of criminal agency in the *corpus delicti* of murder may be proved by circumstantial evidence (State v. Kauffman, supra, and cases cited) and the rule that full proof of the *corpus delicti* independent of the confession is not required (see for statement of rule State v. Skibiski, 245 Mo. 459, 463, 150 S. W. 1038; State v. McGuire, 327 Mo. 1176, 39 S. W. (2d) 523, and cases cited; State v. Kauffman, supra) it is clear that the *corpus delicti* was sufficiently proved to authorize taking into consideration defendant's extrajudicial confession. With that confession in addition to the other evidence the case against defendant is complete. Even without it we think there was ample evidence to sus-

tain a finding that the fire was of incendiary origin, set pursuant to the conspiracy admitted by defendant on the witness stand.

██ II. The further contention is made in appellant's assignment of errors that the State's case failed and defendant's demurrer to the evidence should have been sustained because there was no proof that defendant "feloniously, wilfully, deliberately, premeditatedly and with malice aforethought" burned the deceased, causing her death; that having charged in the indictment that the burning and death of May Frazer was the result of a felonious, wilful, deliberate and premeditated design against her person the State was required to prove such fact whether or not it was necessary so to charge in the indictment, and having failed to so prove the State failed to prove the offense charged.

The indictment charges that the named defendants "did unlawfully, wilfully, feloniously and maliciously set fire to and burn a certain dwelling house, to-wit, the Buckingham Hotel Annex, known as number 4954 West Pine Boulevard, one May Frazer then and there before, at and during said burning being in said dwelling house; that they, the said (defendants) in so unlawfully, wilfully, feloniously and maliciously setting fire to and burning the said dwelling house as aforesaid, then and there feloniously, wilfully, deliberately, premeditatedly and of their malice aforethought did mortally burn the body of the said May Frazer, of which said mortal burns the said May Frazer on the said 5th day of December, 1927, at the city of St. Louis, did die;" concluding with the usual concluding clause of a murder indictment.

It will be observed that the indictment did not charge a design to kill May Frazer or any person. It charged that the defendants wilfully, etc., burned the building and *in so doing* feloniously, etc., committed the homicide. Neither did the proof show that defendant or his co-indictees intend to destroy human life in burning the building. It was not necessary so to charge or to prove. There need not be a design to take human life in order to make a homicide committed in the perpetration of arson murder in the first degree. Such is the necessary effect of the statute. The statute, Section 3982, Revised Statutes 1929, makes a homicide committed in the perpetration of arson, rape, robbery, burglary or mayhem murder in the first degree. Proof that the homicide was committed in the perpetration of one of said crimes may be made under an indictment charging deliberate, premeditated murder in the usual form. [State v. Nasello, 325 Mo. 442, 30 S. W. (2d) 132, and cases cited; State v. Messino, 325 Mo. 743, 30 S. W. (2d) 750.] When it is so proved, then, by force of the statute it is unnecessary to prove the premeditation, deliberation,

etc., which otherwise would have to be proved in order to constitute first degree murder. "Such proof is tantamount to that premeditation, deliberation, etc., which otherwise are necessary to be proven in order to constitute murder in the first degree." [State v. Daly, 210 Mo. 664, 679, 109 S. W. 53.] Nor is it necessary to charge the conspiracy in order to admit proof that the offense charged was committed pursuant to a conspiracy. [State v. Nasello, supra; State v. Messino, supra.] This point is ruled against appellant.

III. In his assignment of errors appellant charges error in the giving of Instruction 2, reading as follows:

"The court instructs you that when two or more persons enter into an unlawful agreement or understanding, whether such agreement or understanding be tacit or expressed, to aid and assist each other in the commission of a crime or series of criminal acts, where the crime or crimes contemplated are such that in the prosecution thereof the natural and probable consequences are that human life will be put in jeopardy, and if in the carrying out of such unlawful design a human life is taken by any of the conspirators, each is equally responsible for such killing, even though at the time such understanding and agreement was entered into such killing was not intended or within the contemplation of the parties as a part of the original design."

The criticism of the instruction is that it assumes instead of leaving it to the jury to find that the conspiracy was entered into. If it does such assumption was merely the assumption of an admitted fact and was not error. Defendant on the witness stand admitted that he entered into the conspiracy to burn the building and that he knew the lives of the inmates would thereby be jeopardized.

IV. In his motion for new trial defendant charged error in the court's refusal of his instructions E and F. Those complaints are not urged in this court but we have examined them. Instruction E would have told the jury that if defendant was found to have set the fire as charged but that in so doing he did not intend to commit murder as charged in the indictment the jury might take such fact into consideration in determining the punishment to be assessed.

The refusal of that instruction was not error. It was of course the duty of the jury to consider, and we presume it did consider all the facts and circumstances in evidence in determining the punishment to be inflicted when it found defendant guilty. The lack of intention to kill might have been and doubtless was argued to the jury by counsel but defendant was not entitled as of right to have the court call attention to and emphasize it in the instructions.

■ By Instruction F defendant sought to tell the jury that if it found that he did not set the fire but did conspire to miss his three o'clock round he could not be found guilty of murder in the first degree. That instruction was properly refused. As pointed out above, if he conspired with another to burn the building and it was burned pursuant to the conspiracy, he assisting therein, the law holds him as guilty as though he had set the fire himself.

■ V. There are several other allegations of error in the motion for new trial but they are not assigned as error nor briefed in this court. Some relate to alleged errors in the *voir dire* examination of jurors and in argument of the State's counsel. Those matters do not appear in the bill of exceptions and since such allegations of the motion for new trial do not prove themselves they are not before us for review. Another allegation is that the punishment assessed is harsh and excessive under the evidence and resulted from passion and prejudice engendered by "incompetent, immaterial and irrelevant testimony, prejudicial argument to the jury and improper examination of the array on *voir dire*." As stated above, the *voir dire* examination and argument do not appear in the record. The alleged "incompetent, immaterial and irrelevant testimony" is not pointed out. That assignment is too vague to merit consideration. We find no such testimony in the record calculated to arouse passion and prejudice. Other allegations of the motion for new trial relate to occurrences at the trial which appear in the record. Though not briefed we have examined and considered them and find them without substantial merit.

The indictment, verdict and judgment are in due form and sufficient. We have carefully examined the record and find no prejudicial error therein. Defendant appears to have had a fair trial and his guilt was clearly established. The judgment of the circuit court is affirmed. *Westhues* and *Fitzsimmons, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur. Date of execution set for July 15, 1932.