**STATE of Missouri, Respondent,**

v.

**Tead ODUM, Appellant.**

No. 48173.

Supreme Court of Missouri,

Division No. 2.

Nov. 13, 1961.

Hale W. Brown, Kirkwood, for appellant.

Thomas F. Eagleton, Atty. Gen., Theodore C. Beckett, Sp. Asst. Atty. Gen., for respondent.

STOCKARD, Commissioner.

Tead Odum was found guilty of homicide in the perpetration of arson, declared to be first degree murder, Section 559.010 RSMo 1959, V.A.M.S., and was sentenced to life imprisonment. He has appealed from the ensuing judgment but has filed no brief in this court. We look to the valid assignments of error in the motion for new trial. Supreme Court Rule 28.02, V.A.M.R.

Appellant first challenges the sufficiency of the evidence to support the verdict. Appellant, who was 93 or 94 years of age at the time of trial, lived in a trailer near De Soto, Missouri, about three-fourths of a mile from the home of Julius Friedmeyer and Charles Von Damme, the two persons for whose death he was charged with murder, each of whom was about eighty years of age. In the morning of July 22, 1959, about 5:45 o'clock, John White, age 16, was sleeping outdoors and was awakened by the barking of his dog. He saw that the nearby Friedmeyer house was on fire. After sounding the alarm he and his father ran to the house. His father attempted to enter a window to the bedroom but it was too high, and he then "knocked the screen out" of the screen door and opened the wooden door but could not enter the house because of the smoke and fire. This was the only door to the building and the screen door was latched from the inside. When the firemen arrived they "knocked down" the fire by use of water, and when they entered the building they found the bodies of Julius Friedmeyer and Charles Von Damme on the floor. One was inside the door by a window, and the other was in front of the doorway leading to the back room and bathroom. Dr. Martin J. Glaser, a post mortem surgeon who performed an autopsy on the body of each, testified that the cause of death was third degree burns and suffocation. He was not asked and did not testify whether or not the bodies indicated any other injuries. Located in one of the rooms of the Friedmeyer house, apparently the

kitchen, was an oil heater or stove (the defendant said it was "to heat water with") fed· by a ⅜-inch copper pipe extending from a 250–275 gallon tank located outside the building. The pipe entered the room through the floor, and when the firemen entered the building the copper pipe was severed about a foot from the stove and fuel oil (but one of the State's witnesses said it "may have been water") was "squirting out the full size of the pipe," or was flowing from the pipe in "a pretty good stream." One of the firemen "crimped" the pipe with a pair of pliers to stop the flow, and he said that when he did so he could not "see whether it was burning when it came out of there." According to one of the firemen the copper pipe "looked like it had been cut with a crude instrument" because it was "heavily mashed." This same fireman also stated that "part of [the pipe] looked like it had been cut with something sharp." He did not look at the part of the pipe attached to the stove, but he did notice that "the stove had scooted a little bit." There was fire "everywheres" and "all over" the house, and "around the fire there was a lot of rags and stuff burning." No one saw appellant at or near the burning house immediately before or at anytime after the fire was discovered. State's witness Hayden White testified that he passed the house about 11:30 o'clock on the night of July 21, and no lights were on in the house and he noticed nothing unusual.

On July 25, 1959, a member of the Highway Patrol questioned appellant. This patrolman testified that he asked appellant if he was responsible for the death of Julius Friedmeyer and that he replied that he was not. The patrolman then stated that when "I confused him some and tangled him up in questioning him" he got mad and said, "It is not my job to hang myself. That is up to a jury." Outside appellant's trailer on a table the patrolman found a pair of appellant's shoes which appellant admitted he was wearing the night of July 21. The patrolman first said that the shoes were "saturated" with fuel oil, but that no laboratory test was made to determine what substance was on the shoes although they had been taken to Jefferson City where the Highway Patrol has a laboratory. He then said that there was not enough oil on the shoes to be scraped off or taken out of the leather as a sample. He determined the substance on the shoes to be fuel oil by the odor and the discoloration, but he admitted that he "wouldn't be able to tell you whether there is much difference between the odor" of fuel oil and kerosene. Appellant told the patrolman, and later testified, that he had spilled kerosene on his shoes while filling his lamp used for lighting his trailer. Another highway patrolman testified that to him the shoes "had a strong odor of what appeared to be fuel oil or kerosene." At some later time this second patrolman went to appellant's trailer at appellant's request to get some medicine for him, and while there the patrolman opened a drawer and found a "bankbook" which showed the record of an account by Julius E. Friedmeyer in the Citizens Bank of Festus. Appellant testified that Mr. Friedmeyer did not have "a very good education" and that he "helped him quite a bit with his business especially his bank balances." In futher explanation appellant stated that "He [Mr. Friedmeyer] was always up in the air and thinking they was cheating him at the bank. Of course, the bank statement was a puzzle to him. He didn't know heads or tails about it. I always did that, you know, that is how they found the bank book in there. * * * He probably left it there himself the last time I had anything to do with him about that."

The coroner arrived at the scene of the fire around six o'clock in the morning, but when he arrived "the fire had been extinguished." He found a "strong box" lying outside of the Friedmeyer house. The box was open, the key was in the lock, it had been burned, and it contained some burned scraps of paper. He placed the box in a trunk in the yard. There is no explanation of how the box was burned if it was in

the yard during the fire, or how it got in the yard if it had been burned while in the house.

The state presented considerable evidence concerning a trip made by Mr. Friedmeyer and appellant on the day before the fire. By reason of arrangements made by Mr. Friedmeyer, appellant and Adolph Hasse and his son met at the Friedmeyer home about six o'clock on the morning of July 21. The exact purpose of the trip that followed is not apparent, but appellant testified that Mr. Friedmeyer wanted him to go with him "to see if he could get trace of this deed of trust." The record does not disclose by whom or to whom the deed of trust was made, what property it covered, or the interest of Mr. Friedmeyer or appellant, if any. This group of four drove to St. Clair, Missouri, to a real estate office. Mr. Hasse, Mr. Friedmeyer and appellant entered the office but Mr. Hasse did not remain with the others and did not hear what conversation took place. They then drove to Hillsboro to the office of Mr. Richard King where they remained about an hour. From there they drove to Cedar Tavern on Highway 30 where they ate lunch. Appellant testified that while at Cedar Tavern he observed a white man and two negro men watching them. Mr. Hasse testified that he did not see these men, and that if they were there he "didn't notice them." However, both appellant and Mr. Hasse testified that at Cedar Tavern two white men did ask for some information about a lake, and these two men testified and verified this occurrence. According to Mr. Hasse, he and the others then drove from Cedar Tavern to Union, Missouri, but appellant stated that the stop at Cedar Tavern for lunch was made after they had gone to Union. In either event, at Union they went to the office of a real estate broker and abstracter who testified that Mr. Friedmeyer, appellant, and a third man (presumably Mr. Hasse) came to his office shortly after one o'clock. He stated that there was no argument between Mr. Friedmeyer and appellant, but that Mr. Friedmeyer "got quite

boisterous and loud in the office." He further stated that "they had been to the Recorder's office regarding the release of a deed of trust and the deputy recorder sent them to my office. I was well acquainted with the matter because he had been there before, and I got out the same files and showed him what had transpired. * * * The deed of trust that he inquired about had been released."

Mr. Hasse testified that while on this trip appellant and Mr. Friedmeyer "did talk and argue," and that "once or twice" between Grubville and De Soto Mr. Hasse heard Mr. Friedmeyer tell appellant that "he was going to foreclose on him" and that appellant replied, "No, you can't do that." However, when asked if Mr. Friedmeyer was trying to collect money from appellant, Mr. Hasse replied: "Whoever owed him. He mentioned the fact he had money out and would like to get it." He also said that when "they got near De Soto they both calmed down," or as he later said, "they quietened down." Appellant denied that Mr. Friedmeyer said he was going to "foreclose on him" and stated that the "conversation we had" pertained to some wood he had cut on some land which Mr. Friedmeyer had conveyed to him.

The group of four returned to DeSoto where Mr. Friedmeyer purchased three watermelons. They then drove to the home of Mr. Friedmeyer, but appellant testified that on the way they stopped at his trailer where he obtained $400 and a receipt book. Mr. Hasse and his son remained while the group sat on the porch of the Friedmeyer house and ate a watermelon, and they then left about 5:45 o'clock. Appellant testified that he and Mr. Friedmeyer sat and talked for several hours. He then offered to pay the $400 to Mr. Friedmeyer in part payment of a $600 note due that day, but Mr. Friedmeyer was unable to find the note. According to the testimony of appellant, while Mr. Friedmeyer was searching for the note, the white man and the two negroes whom he had seen at Cedar Tavern came in, and without

saying anything attacked him. In the scuffle with the white man, who stabbed at appellant with a knife, appellant received a cut in the groin. The man then hit appellant in the head and knocked him down and kicked him a "couple of times." Appellant was "paralyzed" and "stiff, like a fellow knocked out that way." The white man then went to the back room where the two negro men were with Mr. Friedmeyer, and appellant could hear them asking Mr. Friedmeyer where he kept his money. The white man remained only about ten minutes. Shortly thereafter appellant "got so he could crawl" and he crawled to the end of the house and eventually made his way to his trailer. A highway patrolman testified that appellant told him that he arrived at his trailer about eight o'clock in the morning. Harry Goff, a young boy, "more or less looked after" appellant and had "the habit" of dropping around every morning to check on him to see if he was all right. On the morning of July 22, when he stopped by he found appellant "all bloody," and when he asked what happened appellant said he was "so weak, now I can't even talk." Goff called a doctor at appellant's request. This doctor testified that he treated appellant for a cut in his groin about two inches in length and less than one-half inch deep apparently made by a sharp instrument.

Otis Copeland, a defense witness, testified that he lived six or seven miles from where appellant lived, and that on July 25, 1959, an automobile in which two negroes and a white man were riding stopped at his house. One of the negroes asked him how they could go to Highway 67 without going through Hillsboro, which incidentally is the county seat. According to Copeland this negro said "I don't want to go through Hillsboro, I will pay you if you will tell me how to get over there without going through Hillsboro, we want to go around Hillsboro." Copeland gave him the requested information and declined to receive any pay. The two negroes and the white man were between 40 and 50 years of age, and Copeland "smelt booze on them."

Appellant contends that there "was no competent evidence upon which the Court (sic) could find that the fire in question was of incendiary origin," and that there is no competent evidence of probative value that he was the criminal agency causing the fire.

This is a circumstantial evidence case, and when the state relies upon such evidence to establish the guilt of the accused, "the facts and circumstances relied upon by the state must not only be consistent with each other and with the hypothesis of accused's guilt, but must also be inconsistent with his innocence and point so clearly and satisfactorily to guilt to exclude every reasonable hypothesis of innocence." State v. Paglino, Mo.Sup., 319 S.W.2d 613, 622.

The state's evidence does not place appellant at the Friedmeyer house later than about six o'clock on the evening of July 21, approximately twelve hours before the fire. However, the state's evidence does not affirmatively show that he left the house that evening. Appellant admitted he was there until shortly after ten o'clock. State's witness Hayden White stated that at 11:30 o'clock that evening the house was dark, and that he noticed nothing unusual. Appellant lived about three-fourths of a mile away, and under these circumstances it may be inferred that appellant had the opportunity to set the Friedmeyer house on fire by remaining at the house or by returning to it if he left.

The only evidence from which a motive on the part of appellant to commit the crime could be inferred was that Mr. Friedmeyer threatened to "foreclose" on appellant. The state relies primarily on the testimony of Mr. Hasse. Appellant admitted he owed Mr. Friedmeyer $600, but there is no evidence whatever that this debt was secured by a deed of trust or mortgage. It does not appear that the deed of trust being investigated by Mr. Friedmeyer on July 21 was executed by appellant, and in any event it had been released. However, one of the highway patrolmen testified without objection

that appellant told him that Mr. Friedmeyer had a chattel mortgage on his property in the amount of $1,000. While appellant was testifying he was not asked about this chattel mortgage and he did not verify or deny its existence. The inference of motive from the evidence is somewhat tenuous but is sufficiently supported.

■ It has repeatedly been held that in a circumstantial evidence case of arson or of murder through the perpetration of arson that proof of opportunity and motive is not enough. In addition, "There must be proof of circumstances from which the jury will be authorized to find the further fact that such fire was of incendiary origin * * * [and] that the accused was the incendiary." State v. Pierson, 343 Mo. 841, 123 S.W.2d 149, 155; State v. Paglino, Mo.Sup., 319 S.W.2d 613, 621; State v. Meadows, 330 Mo. 1020, 1225, 51 S.W.2d 1033, 1036. This means that "there must be some evidence, direct or circumstantial, that the person charged intentionally started or set the property on fire." State v. Paglino, Mo. Sup., 291 S.W.2d 850, 857. See also State v. Ruckman, 253 Mo. 487, 161 S.W. 705.

■ The usual, or perhaps the most frequently appearing circumstance to show that the fire which caused the death of the person charged to have been murdered was of incendiary origin is that some highly combustible material was employed. Here the state contends it was fuel oil, and the jury could so find, but the proof by the state of so simple a fact as the substance of the fluid spilling from the copper pipe is not without some question. This case does not present the usual situation where a highly combustible material was found at a place where it ordinarily would not have been unless it was placed there by someone with an incendiary intent. Here, the circumstance of incendiary origin is the fact that the copper pipe apparently was cut permitting the fuel oil to drain into the room. We need not determine whether or not the above facts and circumstances would be sufficient for a jury reasonably to infer that

the fire in this case was of incendiary origin, because assuming the evidence to be sufficient, we are of the opinion that the evidence of facts and circumstances is insufficient for the jury reasonably to infer that the appellant was the incendiary, that is, for the jury to find that appellant intentionally cut the copper pipe and intentionally started or set the fire. We shall review the evidence as to this.

The evidence does not affirmatively place appellant at or near the Friedmeyer house closer than approximately eight hours before the fire was discovered. Yet, if the theory of the state is correct, the fire when started and fed by fuel oil would have burned quickly. The evidence was that the fire was throughout the interior of the house and that it burned quickly and furiously. Therefore, if the fire was of incendiary origin the person who set it did so shortly before six o'clock in the morning. There was but one door to the house. When the fire was discovered that door was closed and the screen door was *locked from the inside.* There is no contention that the lock was one which automatically locks when the screen door was closed. The inference from this circumstance is that the person responsible for the fire being started, whether intentionally or accidentally, either remained in the house or if he left he did so in some way other than through the door. The state suggests in its brief that appellant, although well over ninety years of age, may have set the fire and then left the house by a window. But other than the testimony of Mr. Hayden White that the window to the bedroom was too high for him to get in it, there is no evidence whatever concerning the size, number, type or location of the windows, or whether they were open, closed or screened, and if screened whether the screens were or were not locked. To infer that appellant set the fire and then left the house by a window is based on pure speculation and conjecture.

The state relies primarily on the fact that three days after the fire appellant's shoes, which he admittedly was wearing on the

night of July 21, were "saturated" with fuel oil. The patrolman who first so testified said that there was not sufficient fuel oil on the shoes so that a sample could be obtained. If this was true it is obvious that they were not "saturated." He then said that he identified the substance by its odor and by the discoloration, but he admitted that he could not tell whether there is much difference between the odor of fuel oil and kerosene. The other witness frankly said that the odor was that of fuel oil *or* kerosene. If the substance was fuel oil this circumstance is consistent with appellant's presence at the Friedmeyer house when fuel oil was spilling on the floor. However, if the substance was kerosene this circumstance is consistent with appellant's explanation which, if true, is inconsistent with the state's theory that the substance on his shoes was fuel oil obtained in the Friedmeyer house when the copper pipe was cut. The state had the burden to establish what the substance was if it wanted to rely on this circumstance, but instead of doing so it established no more than it was either fuel oil *or* kerosene.

We see little significance to the fact that the bankbook was found in appellant's trailer. It could have been there for many reasons. Certainly its presence is not a circumstance warranting an inference that appellant intentionally set fire to the Friedmeyer house. A bankbook as such is a mere record; it has no value. The evidence does not show that the bankbook was ever in the "strong-box," or that the "strong-box" belonged to either Mr. Friedmeyer or Mr. Von Damme, but this is probably a fair inference. In this connection, the "strong-box" was found *outside* the Friedmeyer house in a *burned* condition. This is a conflicting circumstance for which there is no explanation in the evidence.

We turn now to appellant's story. Admissions made by him may be used to establish a submissible circumstantial evidence case, but other than the fact that his story is somewhat bizzare it does not contain any admissions constituting circumstances from which it reasonably may be inferred that he intentionally set the fire. The jury could disbelieve his story, and obviously did so, but that fact or that this court might not be inclined to believe such a story cannot supply a missing essential element in the state's circumstantial evidence case.

In State v. Ruckman, the state's evidence established that several hours prior to the time a fire was discovered in a nearby pool hall the defendant was in his hotel room, but it also established a motive on the part of defendant for arson and circumstances from which it could be inferred that the fire was of incendiary origin. The state's evidence also was to the effect that "if" the defendant had left his hotel room and walked with his shoes off he could have gone down the stairs and out to the alley through a certain room and back to his room without being detected. This court held that "the state's own evidence tends to show that the defendant did not cause the fire." [253 Mo. 487, 161 S.W. 708] In the pending case the state's evidence was that the screen door to the only door to the house was locked from the inside which necessarily indicates that whoever started the fire did not leave the house, or that if he did he left in some manner other than through the door. The state argues, in effect, that if appellant started the fire he could have left the house by crawling out of a window, but this requires the assumptions that a person over ninety years of age could have crawled out of a window of unknown size, height and location, when there is no evidence whatever whether the window was open, locked or screened, or if screened whether the screen was locked. In this case, as in the Ruckman case, the state's own evidence, insofar as it goes, tends to show that appellant did not cause the fire. It is true that the finger of suspicion points toward appellant, but suspicion, even strong suspicion, is not by itself sufficient to support a finding of guilty. The facts of this case place it precisely within the rule stated in the Ruckman case where it was said: "All the facts

and circumstances shown by the state's evidence could exist and yet the defendant be innocent of any crime. The evidence as a whole leaves too much room for doubt and mistake and does not possess sufficient proof of guilt to authorize the state to deprive defendant of his liberty."

The judgment is reversed and the cause is remanded.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.