**STATE of Missouri, Respondent,**

**v.**

**Roy Lee ENGBERG, alias Walter Johnson, Appellant.**

**No. 50188.**

Supreme Court of Missouri,

Division No. 2.

March 9, 1964.

John G. Madden, Jr., Donald E. Willson, and Larence C. Schrader, Kansas City, for appellant.

Thomas F. Eagleton, Atty. Gen., Jefferson City, James P. Jouras, Sp. Asst. Atty. Gen., Kansas City, for respondent.

PRITCHARD, Commissioner.

Defendant was found guilty of the offense of first degree murder by the verdict of a jury and his punishment was assessed by the jury at life imprisonment. After an unavailing Motion for New Trial, defendant has perfected his appeal to this court. Inasmuch as defendant contends that the state failed to make a submissible case, and the evidence fell short of showing the applicability of the submitted felony-murder doctrine (Section 559.010, RSMo 1959, V.A.M.S.), we set forth the facts in some detail.

The bizarre events of the early morning hours of June 8, 1962, and subsequent happenings, began with an armed robbery of a neighborhood tavern located at Ninth and Brighton streets in Kansas City, Missouri. This robbery is the felony relied upon by the state to sustain the conviction of defendant for first degree murder, the homicide having been committed some time later in a north-south alleyway on Thirty-Sixth Street between Harrison and Troost streets.

The facts of the robbery were testified to by witnesses W. F. Rawn and his wife Leora. They owned and operated the business known as the Community Tavern at 5000 East Ninth Street (Ninth and Brighton streets) in Kansas City, Missouri. At about one o'clock in the morning of June 8, 1962, two men came into the tavern, taking seats at opposite ends of the bar. They each had a couple of drinks, and finally one of them, identified by both Mr. and Mrs. Rawn as being the defendant, got up, went over by the telephone near the open front door, reached in his pocket, pulled out a revolver, broke it open and snapped it shut, and said, "This is a hold-up." All the persons present were herded back to the ladies' room, after which Mrs. Rawn was required by the men to return to the bar and open the safe. Somewhere in the neighborhood of $235.00 in paper currency and change was taken. Mr. Rawn identified State's Exhibit 1 as being the straw hat worn by defendant at the time of the robbery.

On the evening of June 7, 1962, four employees of the Gas Service Company, William D. Willsey, Ted Francis Gumminger, Robert G. Fetters, and Charles Edward Coleman, had been to a pipe fitters' union meeting at the American Legion Hall at Linwood and Paseo avenues until around midnight and had thereafter gone to the Lorelei Bar in downtown Kansas City where they stayed about an hour. They then proceeded back to the Legion Hall to pick up other automobiles, and when they arrived at Linwood and Charlotte, Willsey, the driver and owner of a 1956 Chevrolet convertible, pulled up at the stop light next to the left side of a 1962 white Galaxie Ford, with the front of the Chevrolet about even with the back of the Ford. There appeared to be only two persons in the Ford, a woman driving and a man sitting close to her. This prompted a remark from one of the men, Ted Francis Gumminger, in the Chevrolet, "Which one of you is driving?" Whereupon the man in the Ford reached around the driver and shot out the right front headlight of the Chevrolet.

The Ford Galaxie then turned to the right and south on Charlotte. With what appears to be great intrepidity, Willsey and his three companions followed the Ford

and found it parked against the curb on Thirty-Fourth Street between Charlotte and Campbell. As they passed the car, one man who was out of it fired two shots. They then heard a gun click. Willsey then stopped and backed up, and the man came over to the side of the Chevrolet, stood right next to it and shot a hole in the right door. At this point intrepidity ceased and Willsey drove off and as he was doing so another shot was fired by the man which went through the back window and out the front windshield.

Gumminger was the only one of these four men who identified defendant as the man who fired the shots. He also got the license number, AW–7097, of the 1962 Ford Galaxie. Three of these four men identified the woman who was driving the Ford as Charlotte Marie Martin when she was brought by the police to the downtown police station with another man, Jack Lamphere. Lamphere had been arrested with Charlotte by officers Deaner and Pinkston, Lamphere having been found by the officers lying down on the rear floorboard of the Ford.

The deceased, George Wilber, a special officer of the Kansas City Police Department, was a partner of the husband of witness Ann Smith in the Alarm Engineering Company. Wilber was on duty the morning of June 8th, and Mrs. Smith received a radio dispatch from him at about 1:42 A.M., whereupon she called the police.

William Phillip Nichols lived in the rear apartment at 3606 Troost Avenue. He was awakened by what sounded like two gunshots in the alleyway, then he heard voices say, "Did you get him?" and "Hell, yes. Let's get out of here." He then heard tires squeal and an engine roar.

Airman Duane E. Finch was parked facing south in his car with his girl friend in front of a garage next to the north-south alleyway at 3601 Harrison. The time was between 1:15 and 1:45 A.M., and he had been there about five to ten minutes

when two automobiles pulled into the alleyway, a white Ford first, which was immediately followed by a green Ford (identified as deceased's). He heard someone shout "halt" and there were three immediate shots. About five minutes later he saw a man come walking down on the north side of Thirty-Sixth Street. This man had a revolver in his hand. Finch saw a red light flashing and the man hid in the bushes, and after a police car went by, this man came across the street. There were street lights in the area and Finch identified the man as defendant.

Robert J. Kelly, Jr., a Detective-Lieutenant, arrived at the homicide scene at approximately 2:30 A.M., and observed the body of deceased, George Wilber, lying face down at the left rear of a 1960 blue (green?) Ford. There was a pencil (State's Exhibit 21) which looked as though it had been broken lying eight feet north of the rear of the car, and a matching pen was found in the shirt pocket of deceased. When he examined the body, there appeared to be an entrance gunshot wound in the center of the spine, and another wound which came out directly behind the left shirt pocket. He found no powder burns on the shirt, and he gave his opinion that a .38 caliber pistol would have to be farther away than a foot to leave no powder burns.

Detective Robert Cool also observed the body of deceased, and found an unfired .44 caliber Smith & Wesson magnum revolver, fully loaded and cocked lying near the right hand underneath the body of the victim.

Police officers Edward Deaner and Willie Pinkston were partners in a patrol car in the district. At 1:33 A.M., being then southbound from Armour Boulevard (Thirty-Fifth Street) on Forest, they received a call in regard to the shootings by the occupants of a white 1962 Ford at the occupants of a white and blue Chevrolet. Deaner and Pinkston then came west on Thirty-Sixth Street, turned north

on Troost, and in the 3500 block on Troost they picked up a 1962 white Ford with what appeared to be two occupants—one female who was driving and a male passenger. Deaner, who was driving, turned his headlights on bright and turned on the red light and siren, and when the traffic light changed at Armour and Troost, the white car turned slowly east and then back south on Forest, with the patrol car following closely. The white Ford stopped at approximately 3510 Forest. Deaner stepped out of his car and turned on his spotlight. He drew his service revolver and laid his arm over the top of the police car pointing in the direction of the passenger in the Ford. The passenger jumped out with a blue steel revolver in his hand, glanced quickly back in the direction of the officers, immediately turned and started running down the sidewalk to the south. Deaner fired a shot into the air, called "halt" several times, and then fired at the suspect. Pinkston, who got out of the patrol car at the same time the fleeing suspect got out of the Ford, also fired twice at him. Deaner identified defendant as the person who was in and who ran from the stopped Ford.

Deaner then walked up beside the car and saw someone else (a third person) lying on the back floorboard. He arrested the two and turned them over to officer Billy L. Trollope, who took them to the police station. The woman first said her name was Leslie Stiles, but later said her name was Charlotte Martin. The other man who was arrested was Jack Lamphere.

Robert W. Wark, a Sergeant with the Police Department laboratory, was in charge of the field crew at the scene of the homicide. He arrived there at 2:38 A.M., and took photographs of the scene and of the 1962 white Ford Galaxie, some of which show its license number, AW-7097, of the state of Colorado. State's Exhibit No. 18 shows the interior of the Ford, with money on the rear floorboard. Wark also found deceased's pencil, State's Exhibit No. 21, lying on the ground, and he picked up from next to deceased's body State's Exhibit No. 20, which is a .38 caliber slug upon which he placed his initials. Wark also identified State's Exhibit No. 22, which is a .38 caliber slug handed to him by officer Pinkston who testified he took it from the mechanic at the Police Garage who in his presence removed it from the right door of Willsey's 1956 Chevrolet convertible. State's Exhibit No. 1, a straw hat, was also in the Ford, this being identified by witness Mr. Rawn as having been worn by defendant at the time of the tavern robbery.

James F. Campbell took charge of the money which was taken from the Ford. He testified that $26.00, all in change, was found in the trunk of the car. The balance of it, $153.00, was all in paper currency, and was taken by Campbell from the rear floorboard behind the driver.

Joanna Marie Wallace, residing at the time of the trial at 1308 Ewing in Kansas City, having been out on bond since July, 1962 (for what offense does not appear), testified that she first met defendant in Denver, Colorado, on May 27, 1962. Two days later Joanna with a girl who was introduced to her as Leslie, a man by the name of Jack Lamphere and defendant made a trip in a 1962 Ford Galaxie automobile to St. Louis via Kansas City. On the way, about three miles west of Coolidge, Kansas, at a small roadside park, some target practice was done by defendant, Lamphere, and the other girl (whom Joanna later learned was Charlotte Marie Martin). The gun was a .38 caliber pistol, which Joanna testified belonged to defendant, but which Charlotte kept in her possession "when it was not in use" in a large purse. After the target shooting, the four went on to St. Louis and stayed at the Holiday Motel where defendant registered under the name of Walter Johnson. They stayed in St. Louis a week, then came back to Kansas City, arriving on June 6. The four of them registered at the U-Smile Motel on

Highway No. 40 and a dog which they had brought from Denver was then put in the Blue Ridge Kennel.

On June 7, Joanna stayed with the three others until around 5:00 P.M., and after dinner they dropped her off at her mother's house in Independence, and she did not thereafter see the defendant. Following her arrest, Joanna went with officer Harlow to the roadside park near Coolidge, Kansas, where the target practicing was done.

Detective Sidney A. Harlow went to Denver, Colorado, on June 27, 1962, and returned two days later with defendant whom he and two other officers had picked up at the city jail in Denver. Upon being brought back to Kansas City, defendant identified State's Exhibit No. 23 to Harlow as being the U-Smile Motel receipt signed by him using the name Walt Johnson.

On February 6, 1963, Harlow and his wife went with Joanna Wallace to the little roadside park which was .7 of a mile east of the Kansas-Colorado line, where Joanna directed him to a tree stump where he located one .38 caliber slug, State's Exhibit No. 24, which he removed from the stump, brought back to Kansas City and turned over to Bill Myers of Ballistics.

Bill Myers compared the three slugs (State's Exhibit No. 20—picked up from the ground at the homicide scene; State's Exhibit No. 22—taken from the right door of Willsey's Chevrolet; and State's Exhibit No. 24—taken by Harlow from the Kansas tree stump) and it was his opinion that they were all lubaloy copper-coated .38 caliber bullets which came from short Colt, western manufacture, cartridges which are more or less extinct—guns are not manufactured for that particular cartridge at present. From the land and groove marks (all of the same width) of these slugs it was his further opinion that they all came from the same gun, a British Enfield .38 caliber revolver.

Johanna Scott with her husband owned and operated the Blue Ridge Animal Clinic at 12626 East Highway 40, Independence, Missouri. On June 7, 1962, between 1:00 and 1:30 o'clock in the afternoon, defendant, giving his name to her as Walt Johnston, brought in a dog to be boarded for a day or a day and a half. Defendant told Mrs. Scott he was staying at the U-Smile Motel, just directly across the highway. He was wearing a very clean white shirt, a tie, gray slacks and a gray, darkish color straw hat with a band on it, but she could not identify State's Exhibit No. 1 as that hat.

On re-call, Detective Harlow testified that the distance from the Community Inn (Rawns' tavern) to Linwood and Charlotte is 5.4 miles, and that it requires 18 minutes to drive that distance, observing all speed limits and traffic signs.

F.B.I. agent J. Hale McMenamin saw defendant at the Bonfire Lounge a mile and a half west of Denver, Colorado, and there placed him under arrest on June 20, 1962. Several photographs of the Bonfire Lounge were identified by McMenamin, and he described where a Nash Rambler car which defendant was driving was located in relation to the Lounge. He did not state for what charge he arrested defendant.

Defendant was charged in usual form with Murder in the First Degree, and by Instruction No. 3 the court instructed the jury concerning the conspiracy of defendant to commit the robbery with others and then the fact of the homicide was submitted and the jury was required to find that the killing was done "in pursuance and execution of said robbery." Thus the case was submitted upon the felony-murder doctrine under Section 559.010, RSMo 1959, V.A.M.S., which section is as follows:

"Every murder which shall be committed by means of poison, or lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homicide which shall be committed in the perpetration or attempt to perpetrate any arson, rape,

robbery, burglary or mayhem, shall be deemed murder in the first degree."

In State v. Burnett, 365 Mo. 1060, 293 S.W.2d 335, 343, the court said:

"It is further established that in the absence of other evidence from which the jury can infer the elements, deliberation and premeditation, these and other constituent elements of murder in the first degree can be inferred from proof that the homicide was committed in the perpetration or attempted perpetration of robbery. In the case of State v. Bradley, supra, 234 S.W.2d 556, 558(1) the court said: ' * * * the proof that the homicide was committed in the perpetration of robbery was tantamount to proof of the constituent elements of the crime of murder in the first degree.' And see State v. Cole, 354 Mo. 181, 188 S.W.2d 43, 189 S.W.2d 541; State v. Meadows, supra [330 Mo. 1020], 51 S.W.2d 1033, 1037(11); State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 308(4)."

Defendant contends that under the facts and circumstances of this case there can be no application of the felony-murder doctrine because there was no causal connection established between the robbery and the homicide; that the state failed to show that the homicide of Wilber was committed while defendant was still in the perpetration of this robbery. He says that, at the most, what the state did show was the possibility that the homicide of Wilber was the result of the frivolous shooting incident that took place at Linwood and Charlotte and at Thirty-Fourth and Campbell.

▇ The matter of the conclusions to be drawn from these events which occurred subsequent to the robbery was for the jury, and the jury was justified in placing a different construction upon the facts than those suggested by defendant. "Escape with the loot was within the res gestae of the robbery; indeed, it was an ingredient

of the crime." State v. King, 342 Mo. 1067, 119 S.W.2d 322, 326. In State v. Messino, 325 Mo. 743, 30 S.W.2d 750, 759 [13], the court quoted from State v. Brown, 7 Or. 186, 209: " 'The act of taking and carrying away * * * commenced when the seizure was made * * * and continued until they [the robbers] had *unmolested dominion* over the property which they had taken. When they first acquired that control, the robbery was ended and not before.' " So far as this record is concerned, defendant contends that the robbers had *unmolested dominion* over the property taken; the robbery *had come to rest*; and the loot had been divided because only $179 of the $235 taken was found in the car.

This contention is answered by the somewhat analogous case of State v. Hershon, 329 Mo. 469, 45 S.W.2d 60. There defendant and two others, armed with revolvers and automatic pistols, robbed a drug store at Twenty-Fifth and Brooklyn streets in Kansas City at about 9:00 or 9:30 o'clock at night. About 9:45 P.M., three officers on tour of duty were driving east on Thirty-First across Jackson Avenue and observed an automobile standing on the east side of Jackson Avenue headed north. The police, intending to investigate the car, backed up and drove into Jackson Avenue, and the other car drove away. The police pursued it, ordered the driver to stop, and while the two cars were rolling about one mile per hour two of the officers jumped out and went to the other car, one toward the door and the other to the rear. At that moment two shots were fired from the pursued car toward officer Dingman, which shots hit him and from which he died. The defendant urged that the court erred in giving Instruction 1 (submitting the felony-murder doctrine) because it did not require a finding that any crime had been committed by the conspirators, and that the shooting was the direct, natural, and proximate result of the conspiracy. The court discussed State v. Nasello, 325 Mo. 442, 30 S.W.2d 132, and State v. Messino, 325 Mo. 743, 30 S.W.2d 750, two companion cases

involving similar facts, and then said, 45 S.W.2d loc. cit. 68:

"In the instant case, facts and circumstances sustain the inference that defendant and his companions agreed together to rob and thereafter to escape by force of arms. And even if their act in stopping their car on Jackson avenue indicated that the three robbers believed that their original agreement had been consummated, the facts and circumstances of the chase and of its tragic ending warrant the inference that in their flight from the police *they renewed their agreement to shoot their way to liberty*." (Our emphasis.)

In People v. Kendrick, 56 Cal.2d 71, 14 Cal.Rptr. 13, 363 P.2d 13, defendant argued that the court improperly instructed the jury that " 'murder which is committed in the perpetration * * * (of) robbery * * * is murder of the first degree * * *' ", because the " 'homicide was too distant in time and space' " to classify it as having " 'occurred during the perpetration of a robbery.' " The court said, 363 P.2d loc. cit. 23:

"Here it appears that the homicide occurred some 48 minutes after the manager of the market was first accosted by defendant as he started to leave the premises. However this period of time must be considered in relation to the evidence that upon getting into his car after the robbery, defendant placed his .32 automatic gun on the seat beside him, then sped away at 70 to 75 miles per hour, and when stopped by Officer Duvall, defendant put a shell into his gun and believing that the officer was intending to arrest him for the robbery, defendant shot Duvall. Accordingly, the homicide could properly be viewed as committed by defendant in an endeavor to effect an escape. 'Robbery, unlike burglary, is not confined to a fixed *locus,* but is frequently spread over considerable distance and varying periods of time. The escape * * * with the loot, by means of arms, necessarily is as important to the execution of the plan as gaining possession of the property. Without revolvers to terrify, or, if occasion requires, to kill any person who attempts to apprehend [him] at the time of or immediately upon gaining possession of said property, [the] plan would be childlike. The defense of felonious possession which is challenged immediately upon the forcible taking is a part of the plan of robbery, or, as the books express it, it is *res gestae* of the crime.' (Citing cases.) The homicide, committed as it was while defendant was in hot flight with the stolen property and in the belief that the officer was about to arrest him for the robbery, falls well within this rule."

See also the case of People v. Ketchel, 59 Cal.2d 503, 30 Cal.Rptr. 538, 381 P.2d 394, 404.

In State v. Glover, 330 Mo. 709, 50 S.W. 2d 1049, 1053, 87 A.L.R. 400, it is said:

" 'The res gestae may therefore be defined as those circumstances which are the undesigned incidents of a particular litigated act, which are admissible when illustrative of such act. These incidents may be separated from the act by a lapse of time more or less appreciable. * * * Their sole distinguishing feature is that they should be the necessary incidents of the litigated act; necessary, in this sense, that they are part of the immediate preparations for, or emanations of such act, and are not produced by the calculated policy of the actors.' "

See also annotations of cases involving the felony-murder doctrine and the application of the principle of continuous acts (similar to the res gestae) leading from the felony to the subsequent homicide in 22 A.L.R. 850 and 108 A.L.R. 847.

Under the evidence and the legitimate inferences to be drawn therefrom in the in-

stant case, and within the rules announced in the above citations, the jury could reasonably find that the defendant with an accomplice perpetrated the armed robbery of Rawns' tavern at Ninth and Brighton somewhere near 1:00 A.M., June 8, 1962. He was positively identified by the Rawns as one of the robbers. It would then have taken him some eighteen minutes to reach the intersection of Linwood and Charlotte. During the same period of time Willsey and his companions arrived at the same intersection from downtown Kansas City. Although it does not appear that the robbers were pursued, it could be inferred by the jury from the fact that defendant and Charlotte appeared alone in the white Ford Galaxie (Lamphere being hidden on the rear floorboard of the car until his apprehension) that they were employing a deception to avoid detection by any pursuers. Defendant at all times had his loaded revolver. In other words, the robbers were still in hot flight. People v. Kendrick, supra. This flight continued up to the time of the shooting of Special Officer Wilber, who commanded defendant to halt, and thereafter when defendant fled on foot. The homicide and the pursuit by Wilber were not the result of the frivolous shooting at Linwood and Charlotte. Indeed, it could be inferred at that point that defendant was trying to throw off Willsey and his companions believing them to be persons by whom or through whom he would be apprehended. If, by reason of the time lapse and distance away from the scene of the robbery, and a division of the loot ($179 of the $235 taken from the Rawns was found), the robbery had come to rest, as contended by defendant, the jury could reasonably find that defendant and his accomplices, still being together, renewed their purpose to flee and to shoot their way to freedom with the loot, as the evidence shows. State v. Hershon, supra.

A short time after the shootings at Willsey and his companions, the jury could find that defendant, in the white Ford Galaxie, was chased into the alley by George Wilber

where the homicide occurred. Defendant was seen by Airman Finch walking along and across Thirty-Sixth Street near the scene of the crime with a revolver in his hand, and the jury could find that he was still in flight from the point where Officers Deaner and Pinkston stopped the white Ford on Forest Street. Defendant's companions were arrested at that time, but defendant fled further to Denver, Colorado, where he was arrested by the F.B.I. and returned to Kansas City by Officer Harlow. While the revolver was not found, the testimony of ballistics expert Myers was that the one slug taken from the target practice tree stump (at which defendant, Charlotte Martin and Lamphere had fired) at Coolidge, Kansas, was fired from the same gun as those found by deceased's body and in the door of the Willsey automobile. From all of this evidence, the state made a submissible case of first degree murder under the felony-murder doctrine. The court did not err in submitting that theory to the jury in Instruction No. 3. The assignments of error [Points I and II(A) and (B)] that the state did not make a submissible case, and that the felony-murder doctrine is not applicable under the evidence, and that the court erred in admitting proof of the robbery (claimed by defendant to be a separate and distinct offense) are ruled against defendant.

Under Point III, defendant claims that the trial court committed prejudicial error in allowing each of the four occupants of the 1956 Chevrolet to describe the shooting incident. The cited case, State v. Griffin, Mo., 336 S.W.2d 364, is not in point. That was not a felony-murder case and there it was held that reversible error was committed in allowing proof of disturbances of peace, assaults, batteries, robbery by means of a dangerous and deadly weapon and other offenses *prior* to the homicide for which defendant was on trial, all of which had no tendency to identify defendant as a participant in the homicide and to refute his alibi. In the instant case, if the testimony of these four witnesses was cumulative, allowing the same was within the

sound discretion of the trial court. State v. Tompkins, Mo., 277 S.W.2d 587, 591 [10–12]; State v. Harris, 334 Mo. 38, 64 S.W.2d 256, 258 [4–5]. We discern no abuse of such discretion. This assignment is overruled.

Instruction No. 2 defines for the jury "Murder in the First Degree" and instructs the jury that every homicide, the killing of a human being, which shall be committed in the perpetration of a robbery shall be deemed "Murder in the First Degree." Instruction No. 3 instructs the jury as to conspiracy to commit robbery and that if in carrying out such design a human life is taken by one of the conspirators, then each of the others is responsible for the killing. Then the jury is required to find that defendant and others had an agreement or understanding to aid and assist each other in the commission of a robbery, and while in pursuance and execution of said robbery deceased was killed while defendant was there present, aiding, abetting or assisting in the commission of robbery, then the jury will find defendant guilty of Murder in the First Degree. Instruction No. 4 properly defined robbery and stated further "that said Robbery shall continue until such time as the participant or participants have unmolested dominion over the property taken from said other person."

■ Defendant does not challenge the form of these instructions, but does, by Point IV, claim that the jury was thereby instructed not only on matters which were improperly admitted into evidence, but concerning which there is absolutely no evidence to support. He agrees that the record contains evidence of a robbery, but does not concede that the record sustains the submission that the robbery had not come to rest. This contention is answered by the discussion above concerning the submissibility of the state's case. By reason of the evidence that one of the participants in the robbery was concealed in the white Ford, that the participants were still together, and that the defendant had a ready and loaded

revolver, the jury could find that these conspirators were still in flight and had not completed their dominion over the property. People v. Kendrick, supra. Or the jury could find, as defendant contends, that the conspirators believed their crime had come to rest, and if so, then it could further find that they renewed their purpose to flee and shoot their way to freedom. State v. Hershon, supra. These instructions are supported by the evidence and reasonable inferences deducible therefrom. Point IV is ruled against defendant.

■ Under Point V defendant claims error in the trial court's giving of Instruction No. 10, and in refusing defendant's offered Instruction No. 13, both on the subject of circumstantial evidence. These instructions are as follows:

"INSTRUCTION NO. TEN

"The Court instructs the jury that direct evidence is that evidence which is of a nature which, if believed, proves the existence of the fact in issue without *interference* (inference?) or presumption and that circumstantial evidence is that evidence which is of a nature which does not directly prove the existence of a fact in issue, but which gives rise to a logical inference that such fact does exist."

"INSTRUCTION NO. THIRTEEN

"The Court instructs the jury that the evidence in this case is mostly circumstantial, that before you can render a verdict of guilty against the defendant on such evidence, you must be satisfied beyond a reasonable doubt that when all the circumstances are considered together that they are absolutely inconsistent with any reasonable theory of innocence and consistent with the theory of defendant's guilt.

"The Court further instructs you that circumstantial evidence should always be cautiously considered and weighed

and that unless you are thoroughly satisfied of the guilt of the defendant beyond a reasonable doubt you should return a verdict of not guilty."

It is apparent that this case consists of *both* direct and circumstantial evidence. It is true that there is no direct evidence, as defendant states, that he was in the alley and that he pulled the trigger of the gun that killed George Wilber. There is, nevertheless, sufficient circumstantial evidence to place defendant at the scene of the homicide and to tie him to the act of shooting Wilber. In this situation, the giving by the trial court of Instruction No. 10 was not error. The definitions of direct and circumstantial evidence in Instruction No. 10 follow those in State v. Cox, Mo., 352 S.W. 2d 665, 670 [2, 3]. The refusal of the trial court to give Instruction No. 13 was not error. "Error cannot be predicated upon a failure to give an instruction on circumstantial evidence unless evidence of that character is solely relied upon for conviction." State v. Cox, supra, loc. cit. 352 S.W.2d 670 [4], and cases there cited. Even if this were a solely circumstantial evidence case, the latter paragraph of Instruction No. 13 is improper. In State v. Letz, 294 Mo. 333, 242 S.W. 681, 684 [4], the court said, "Instruction B advised the jury that circumstantial evidence should always be cautiously considered. This court has condemned instructions of this character, the law making no distinction between direct and circumstantial evidence. (Citing cases.) Instructions should not be given which have a tendency to minimize the effect of circumstantial evidence and prevent the jury from giving it proper consideration." Point V is ruled against defendant.

Under the last point, Point VI, defendant claims that error was committed in the admission of the testimony of F.B.I. agent J. Hale McMenamin concerning his arrest of defendant in Denver, Colorado, and the details thereof, because, (1) "His presence and testimony was calculated to be and offered for the sole purpose of inflaming and prejudicing the jury against the Defendant;" (2) "The details of the arrest did not tend to prove any essential element of the crime charged, did not concern a material factual issue, and most certainly inflamed and prejudiced the jury;" and (3) "The admission into evidence of the details of another crime is clearly prejudicial error." The evidence shows that defendant was in Kansas City with his accomplices prior to the robbery and murder. He fled, gun in hand, when the white Ford in which he was riding was stopped by the police at 3510 Forest, leaving his accomplices to be arrested. Defendant was not seen again until he was arrested by McMenamin in Denver, Colorado, twelve days later. Evidence of defendant's flight from the scenes of his crimes is admissible. State v. Harris, Mo.App., 325 S.W.2d 352, 358 [14–16]. We find no allusion to "details of another crime" in McMenamin's testimony. He merely gave the details of his arrest of defendant, in which we find no prejudicial error. The defendant's last point is overruled.

We have examined the record concerning the matters contained in Supreme Court Rules 28.02 and 28.08, V.A.M.R. and we find no error.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.